**WHITNEY NATIONAL BANK IN JEFFERSON PARISH, Appellant,**

v.

**BANK OF NEW ORLEANS AND TRUST COMPANY et al., Appellees.**

**James J. SAXON, Comptroller of the Currency, Appellant,**

v.

**BANK OF NEW ORLEANS AND TRUST COMPANY et al., Appellees.**

**Nos. 17672, 17681.**

United States Court of Appeals District of Columbia Circuit.

Argued May 24, 1963.

Decided Aug. 14, 1963.

Petition for Rehearing En Banc Denied Oct. 17, 1963.

Mr. Dean Acheson, Washington, D. C., with whom Messrs. W. Graham Claytor, Jr., and Brice M. Clagett, Washington, D. C., were on the brief, for appellant in No. 17,672.

Mr. David L. Rose, Atty., Dept. of Justice, with whom Messrs. David C. Acheson, U. S. Atty., and Joseph D. Guilfoyle, Director of Operations, Civil Div., Dept. of Justice, and Morton Hollander, Atty., Dept. of Justice, were on the brief, for appellant in No. 17,681.

Mr. Edward L. Merrigan, Washington, D. C., for appellee Bank of New Orleans & Trust Co. and certain other appellees.

Mr. Bentley G. Byrnes, New Orleans, La., with whom Mr. Edward L. Merrigan, Washington, D. C., was on the brief, for appellee Louisiana State Bank Commissioner.

Mr. James F. Bell, Washington, D. C., filed a brief on behalf of the National Ass'n of Supervisors of State Banks, as amicus curiae, urging affirmance.

Before WILBUR K. MILLER, WASHINGTON and DANAHER, Circuit Judges.

WILBUR K. MILLER, Circuit Judge.

The City of New Orleans, Louisiana, is conterminous with the Parish of Orleans in which it is located. It is south of and adjacent to that part of Jefferson Parish which lies east of the Mississippi River. The latter is a populous area, already commercially and industrially active, in which further development is expected to be rapid and extensive.

The Whitney National Bank of New Orleans, by far the largest bank in Louisiana, with its main office and numerous branches in Orleans Parish, draws a substantial volume of business from customers in east Jefferson Parish. For some time it has desired to extend its operations into that area, but cannot establish branches therein because a Louisiana statute,[1] which is construed as forbidding such expansion by state banks, is made applicable to national banks in Louisiana by a federal statute.[2]

After several years of studying alternate methods of doing indirectly what these statutes prohibited it from doing directly, The Whitney National Bank of New Orleans finally decided upon a corporate reorganization, the details of which included the formation of a holding company to own two new national banks: Crescent City National Bank, a mere conduit to exist temporarily in name only, and Whitney National Bank in Jefferson Parish, to be operated as we shall describe. All three new organizations were to be financed with funds furnished by Whitney of New Orleans.

Through elaborate maneuvers which will be explained later, the result would be that Whitney Holding Corporation would own all the stock, except qualifying shares, of Whitney of New Orleans and Whitney in Jefferson Parish; and the shares of Whitney Holding Corporation would be owned by the shareholders of the original Whitney of New Orleans in the same proportion as before. The holding company feature of the plan required the approval of the Board of Governors of the Federal Reserve System, and the remainder of it required the approval of the Comptroller of the Currency.

Commenting on the proposed plan, Whitney's president on October 28, 1961, advised his shareholders it had been decided to use the holding company device instead of the "affiliated" bank plan which we approved in the Camden Trust case[3]

---

1. 2 LSA–R.S. 6:54 (1951).

2. Title 12 U.S.C. § 36 provides in pertinent part.

 "*Branch banks*

 "The conditions upon which a national banking association may retain or establish and operate a branch or branches are the following:

 \* \* \* \* \* \* \*

 "(c) A national banking association may, with the approval of the Comptroller of the Currency, establish and operate new branches: (1) Within the limits of the city, town or village in which said association is situated, if such establishment and operation are. at the time expressly authorized to State banks by the law of the State in question; and (2) at any point within the State in which said association is situated, if such establishment and operation are at the time authorized to State banks by the statute law of the State in question

by language specifically granting such authority affirmatively and not merely by implication or recognition, and subject to the restrictions as to location imposed by the law of the State on State banks. \* \* \*

 \* \* \* \* \* \* \*

 "(e) No branch of any national banking association shall be established \* \* \* without first obtaining the consent and approval of the Comptroller of the Currency.

 "(f) The term 'branch' as used in this section shall be held to include *any branch bank, branch office, branch agency, additional office, or any branch place of business* located in any State \* \* \* at which deposits are received, or checks paid, or money lent." (Emphasis supplied.)

3. Camden Trust Company v. Gidney, 112 U.S.App.D.C. 197, 301 F.2d 521, cert. denied 369 U.S. 886, 82 S.Ct. 1158, 8 L.Ed.2d 287 (1962).

largely because, under the latter arrangement, it is impossible to attain and preserve identity of ownership of the two banks. He said:

"* * * From the depositors [sic] point of view, those in the smaller bank will be assured of the same management which directs the larger one without possibility of interruption. They will be assured of access to the large loan limits of the combined banks. They will have the security which arises out of the fact that the large and the small bank have identical ownership as well as management.

"We * * * elected to use a holding company rather than to get a group of stockholders to form an affiliate in Jefferson Parish. An affiliate by law must depend on ownership of a majority of the stock in the Jefferson Parish bank by Whitney Bank stockholders. Affiliate relationship can be suddenly terminated if stock ownership in the Jefferson Parish bank changes over a period of time until control ceases to be in the stockholders of the large New Orleans bank. This large bank cannot control those changes in stock ownership, and under the law when the control ceases to be in the stockholders of the large bank the two banks cannot have common officers or directors. As we view it, the change of ownership of the stock could be very embarrassing to either or both banks,—even to the extent of having a bank which we no longer control still bearing the name 'Whitney National Bank.'

"Under the holding company approach the relationship is completely owned by the stockholders of the holding company who will be all the present stockholders of the Whitney National Bank and their successors.

"By reason of the common ownership of the two banks in a holding company there can arise no conflict of interest between them as there can between affiliated banks. There will be no minority stockholders to be affected.

"From the customer point of view there will be no conflict of interest arising out of the manner in which the customer sees fit to divide his business between the commonly owned banks in the two parishes. He will have the full benefit of a relationship with the large bank and its officers.

"Because of the permanent relationship between the large and the smaller bank, the smaller one can operate safely with a small capitalization."

This plan was carried out almost completely. Whitney of New Orleans organized the Whitney Holding Corporation with $350,000 initial capital furnished by it, with which Whitney Holding acquired the "phantom" [4] Crescent City National Bank. The Whitney Bank then by consolidation transferred its assets to Crescent City National Bank (owned by Whitney Holding) and immediately changed Crescent City's name to The Whitney National Bank of New Orleans. Then the new Whitney of New Orleans furnished the Holding Corporation with $650,000 [5] with which the latter organized The Whitney National Bank in Jefferson Parish. And all the Holding Corporation's capital stock was distributed proportionately to the stockholders of the original Whitney of New Orleans.

All this was done with the approval of the Board of Governors of the Federal Reserve System (which had the duty of passing on the validity of the holding company arrangement) and of the Comptroller of the Currency. The only step not yet taken is the Comptroller's issuance to The Whitney National Bank in

4. It was so characterized by the Federal Reserve Board of Governors. Crescent City never opened for business and was not intended to do so.

5. This payment was described as a dividend.

Jefferson Parish of a Certificate of Authority which will enable it to begin business.

On June 9, 1962, three Louisiana state banks [6] filed this suit against the Comptroller of the Currency, James J. Saxon, in the United States District Court for the District of Columbia. Their complaint, after describing Whitney's plan of reorganization and the various steps already taken pursuant to it, alleged that the Comptroller

"(19.) * * * is presently considering almost immediate issuance of his Certificate or Certificates of Authority which will enable the new branch bank facility to open and commence to operate a banking business at one or more locations in Jefferson Parish under the name of Whitney National Bank of Jefferson Parish.

"(20.) Plaintiffs verily believe that defendant, unless enjoined, will, without any notice of intention to plaintiffs, issue in the name of Whitney National Bank of New Orleans, or Whitney Holding Corporation, or Whitney National Bank of Jefferson Parish the aforesaid Certificate or Certificates of Authority, all in contravention of the letter, intent and purposes of Title 12 U.S.C. §§ 27, 36 and 1841, et seq., and that after said Certificate or Certificates are issued as aforesaid, plaintiffs will have no adequate remedy at law, either to compel revocation of same or to prevent the Whitney Bank from so operating in Jefferson Parish.

"(21.) Plaintiffs further allege that the unlawful and arbitrary issuance by defendant of his certificate or certificates, authorizing the Whitney National Bank to open and operate a new branch facility or facilities in Jefferson Parish as aforesaid will cause great and irreparable damage to the banking business of said plaintiffs * * *."

The relief prayed for was a declaration that 12 U.S.C. §§ 27, 36 and 1841 et seq., prohibit the Comptroller from issuing a Certificate of Authority to the newly-organized Whitney-Jefferson bank, and that he be preliminarily and permanently enjoined

" * * * from issuing to the Whitney National Bank, also known by the name of Crescent City National Bank, the Whitney Holding Corporation and/or the Whitney National Bank of Jefferson Parish, a Certificate or Certificates of Authority authorizing the establishment of new branch bank facilities by them or any of them in the name of Whitney National Bank or otherwise in Jefferson Parish, State of Louisiana * * *."

After the complaint was filed, the Comptroller at first voluntarily withheld issuance of a Certificate of Authority to Whitney-Jefferson, but later indicated he would do so no longer. As a consequence, the plaintiffs moved for a temporary restraining order which was issued by District Judge Hart June 27, 1962; and on July 10, 1962, District Judge Holtzoff entered a preliminary injunction in accordance with the prayer of the complaint.

Meanwhile the Louisiana legislature of 1962 adopted a State Bank Holding Com-

---

6. Bank of New Orleans and Trust Company, located in Orleans Parish, Merchants Trust and Savings Bank, located in the eastern portion of Jefferson Parish, and Guaranty Bank and Trust Company, located in Lafayette Parish.

On June 26, 1962, Merchants Trust and Savings Bank moved, in its own behalf only, to dismiss the action and so withdrew as a party plaintiff. The Bank of Louisiana in New Orleans was allowed to intervene as a plaintiff on July 5, and on July 10 intervention of Whitney of Jefferson Parish as a defendant was permitted. On September 7, 1962, the State Bank Commissioner was allowed to intervene as a plaintiff. The District Court on September 26, 1962, granted the motion of National Association of Supervisors of State Banks for permission to appear as *amicus curiae.*

pany Act, being Act 275,[7] which the Governor designated as emergency legislation so that it became effective July 10, 1962. Section 3(5) of that Act (6:1003(5)) is in pertinent part as follows:

> "It shall be unlawful:
>
> \* \* \* \* \* \*
>
> "(5) for any bank holding company or subsidiary thereof to open for business any bank not now opened for business, whether or not, a charter, permit, license or certificate to open for business has already been issued \* \* \*."

Admittedly, this measure was passed to prohibit the opening of Whitney-Jefferson.

Numerous pleadings, affidavits and other documents were filed by the various parties, including the opinion of the Board of Governors of the Federal Reserve System approving Whitney Holding Corporation's acquisition of the Whitney National Bank of New Orleans, as reorganized, and Whitney National Bank in Jefferson Parish, and Governor Robertson's dissent from that action.

Cross motions for summary judgment, the Comptroller's motion to dismiss, and the plaintiffs' motion for a permanent injunction came on for hearing before District Judge McLaughlin on October 10, 1962. He filed a memorandum opinion holding that Louisiana Act 275, § 3 (5) makes it unlawful for Whitney-Jefferson to commence business, and that the Comptroller should be enjoined from issuing to it a Certificate of Authority to open its doors. Having so concluded, Judge McLaughlin deemed it unnecessary to consider whether the establishment of Whitney-Jefferson violated 12 U.S.C. § 36(c). His opinion is reported in 211 F.Supp. 576 (1962).

Findings of fact and conclusions of law were filed by Judge McLaughlin December 5, 1962. The findings include the following:

> "4. Intervening defendant, Whitney National Bank in Jefferson Parish (Whitney-Jefferson), is a national banking association and a wholly owned subsidiary of Whitney Holding Corporation (Whitney Holding), a bank holding company incorporated under the laws of Louisiana.
>
> "5. Whitney National Bank of New Orleans (Whitney-New Orleans), not a party to this suit, is also a national banking association and a wholly owned subsidiary of Whitney Holding.
>
> "6. Whitney-New Orleans, created approximately 79 years ago, is the largest bank in Louisiana and one of the largest financial institutions in the southern portion of the United States, and presently conducts its business only in Orleans Parish (a political subdivision coterminous with the City of New Orleans).
>
> "7. For a long period of years, Whitney-New Orleans has been desirous of expanding its banking operations into Jefferson Parish, Louisiana, a neighboring parish or county, but was prohibited by the operation of 12 U.S.C. § 36(c) and Louisiana Revised Statutes, Title 6, § 54, from establishing branch facilities outside of Orleans Parish. In an effort to accomplish its desired objective, Whitney-New Orleans decided to utilize the device of a bank holding company.
>
> "8. The management of Whitney-New Orleans thereupon obtained from the Comptroller of the Currency informal approval of its desire to expand banking operations into Jefferson Parish through the formation of a bank holding company and set into motion the following proposed steps designed to accomplish such purpose:
>
> "*First*: With $350,000. of its funds, Whitney-New Orleans created Whitney Holding, and distributed the 5,600 shares it received in Whitney Holding to its stockholders.

---

7. Now codified as 2 LSA–R.S. 6:1001–6:1006 (1962 Supp.).

"*Second*: Whitney Holding invested the $350,000. provided by Whitney-New Orleans in a new national banking association, Crescent City National Bank, and received in return all of the shares of stock in Crescent City National Bank.

"*Third*: Whitney-New Orleans, Crescent City National Bank and Whitney Holding then entered into an agreement whereby Whitney-New Orleans was consolidated into Crescent City National Bank under the name Whitney-New Orleans, and Whitney Holding became the owner of all of the shares in the consolidated banks and the stockholders of the original Whitney-New Orleans received the remainder of the stock in Whitney Holding.

"*Fourth*: Whitney-New Orleans then provided $650,000. to Whitney Holding with which to purchase all of the stock in Whitney-Jefferson.

"9. On October 3, 1961, defendant Comptroller gave preliminary approval to the formation of the Crescent City National Bank and the Whitney National Bank in Jefferson Parish, Louisiana, subject to approval by the Federal Reserve Board of the application of Whitney Holding to become a bank holding company under the Bank Holding Company Act of 1956.

"10. On May 3, 1962, the Federal Reserve Board approved the application of Whitney Holding.

"11. Subsequently, defendant Comptroller then approved the consolidation of the existing Whitney-New Orleans into the Crescent City National Bank under the original name of Whitney-New Orleans, and this was accomplished.

"12. Whitney Holding thereupon purchased all of the stock of Whitney-Jefferson for $650,000., by which time the Articles of Association and the Certificate of Organization of Whitney-Jefferson had been executed and filed with defendant Comptroller.

"13. On June 9, 1962, before defendant Comptroller could issue a Certificate of Authority authorizing Whitney-Jefferson to commence the business of banking in Jefferson Parish, Louisiana, this suit was instituted.

"14. Defendant Comptroller voluntarily withheld issuance of a Certificate of Authority until June 27, 1962, when a temporary restraining order was issued by this Court. After hearing, a preliminary injunction was ordered granted on July 6, 1962, and was signed and filed on July 10, 1962.

"15. On the same date, July 10, 1962, Louisiana Act 275 of 1962 became effective as the law of Louisiana. Section 3(5) of said Act provides:

" 'It shall be unlawful * * * (5) for any bank holding company or subsidiary thereof to open for business any bank not now opened for business, whether or not a charter, permit, license or certificate to open for business has already been issued.'

* * * * * *

"18. Plaintiffs and intervening plaintiffs have presented sworn, uncontroverted facts to show that, if defendant Comptroller is not prohibited from issuing his Certificate of Authority to Whitney-Jefferson, each plaintiff bank will sustain irreparable injury and damage in excess of $10,000., exclusive of interest and costs."

Among the court's conclusion of law are the following:

"2. Defendant Comptroller of the Currency has no discretion to issue a Certificate of Authority to a national banking association to commence a banking business in a manner prohibited by law (Commercial State Bank v. Gidney, 174 F.Supp.

770, 778, affd. [108 U.S.App.D.C. 37,] 278 F.2d 871 (D.C.App.1960); Camden Trust Co. v. Gidney, [112 U.S.App.D.C. 197,] 301 F.2d 521 (D.C.App.), cert. denied, 369 U.S 886, [82 S.Ct. 1158, 8 L.Ed.2d 287] (1962); Gidney v. Wayne Oakland Bank, 252 F.2d 537 (C.C.A.6), cert. denied 358 U.S. 830 [79 S.Ct. 50, 3 L.Ed.2d 69] (1958)).

"3. The Federal Bank Holding Company Act, at 12 U.S.C. § 1846, reserved to the States such powers and jurisdiction as they had or might exercise in the future with respect to banks, bank holding companies and subsidiaries of bank holding companies and Section 3(5) of Louisiana Act 275 of 1962 was enacted pursuant to and within the scope of the said powers and jurisdiction so reserved to the States by Congress, and said statute is constitutional (Braeburn Securities Corp. v. Smith, [15 Ill.2d 55,] 153 N.E.2d 806, appeal dismissed for want of a substantial Federal question, 359 U.S. 311 [79 S.Ct. 876, 3 L.Ed.2d 831] (1959); Opinion of the Justices, [102 N.H. 106,] 151 A.2d 236 (N.H.1959); also 12 U.S.C. § 1842(d), Federal Bank Holding Company Act)).

"4. Act 275 of 1962 is directly applicable to intervening defendant, Whitney National Bank in Jefferson Parish, a wholly owned subsidiary of a Louisiana-incorporated bank holding company, and said statute makes it unlawful for said intervening defendant to commence the business of banking in Louisiana. Accordingly, defendant Comptroller of the Currency should be permanently enjoined and restrained from issuing a Certificate of Authority licensing Whitney-Jefferson to commence such unlawful operations (Commercial State Bank v. Gidney, supra; Wayne Oakland Bank v. Gidney, supra).

"5. Plaintiff and intervening plaintiff banks, faced with proposed invasion of property rights and injury from the proposed unlawful issuance by defendant Comptroller of a Certificate of Authority to intervening defendant Whitney-Jefferson, have standing to bring this suit, and they have no other adequate remedy at law (Wisconsin Bankers Association v. Robertson, 190 F.Supp. 90, 94, affd. [111 U.S.App.D.C. 85] 294 F.2d 714 (App.D.C.), cert. denied 368 U.S. 938, [82 S.Ct. 381, 7 L.Ed.2d 338,] rehearing denied 368 U.S. 979, [82 S.Ct. 477, 7 L.Ed.2d 441] (1961); Commercial State Bank v. Gidney, supra; Wayne Oakland Bank v. Gidney, supra.)

\*　　\*　　\*　　\*　　\*　　\*

"7. The cross motions for summary judgment of plaintiffs and intervening plaintiff should be and are granted; and the motions for summary judgment of the defendant and intervening defendant and the cross motion to dismiss by defendant Comptroller should be, and are, denied."

Judgment was entered in accordance with the conclusions. Whitney-Jefferson filed notice of appeal therefrom on January 31, 1963, and the Comptroller's notice of appeal was filed February 1, 1963. That explains why there are two separately styled and numbered proceedings in this court in what is in reality a single appeal.

In the brief for the Comptroller it is argued vigorously and at some length that the appellees have no standing to challenge his administrative determination to issue a Certificate of Authority to Whitney-Jefferson.[8] The only purpose of the state banks in filing this suit, says his brief, is to avoid the lessening of business and profits which might result from the presence of a new competing institution in the area; but, he continues, possible economic disadvantage from com-

---

8. It is interesting to observe that the other appellant, Whitney-Jefferson, does not argue or even suggest that the state banks lack standing to sue.

petition is not enough, absent a special Congressional grant of standing, to permit the disadvantaged party to invoke the jurisdiction of the courts.

■ We were told by his counsel on oral argument, however, that the Comptroller had instructed him not to press the lack of standing argument, as he desired a ruling on the merits. If we could accept the Comptroller's offer to waive the point concerning standing, this opinion would be substantially shortened, as the discussion of the merits, when reached, will not detain us long. The point cannot be thus waived by the Comptroller because it is jurisdictional: if the appellees lack standing to sue, their complaint should have been dismissed on that ground. Jurisdiction cannot be conferred by waiver; it is a threshold question which must be examined.

■ The Comptroller's brief contends that "appellees can point to no legal or actionable wrong to them arising from the opening of a new national bank." It is, of course, true, as held in Alabama Power Co. v. Ickes, 302 U.S. 464, 58 S.Ct. 300, 82 L.Ed. 374 (1938), that one who has no contractual or statutory right to be free of competition, and no property right which would be infringed thereby, has no standing to challenge federal administrative action which simply increases the amount or effectiveness of competition. And we held in Union Nat. Bank of Clarksburg v. Home Loan Bank Bd., 98 U.S.App.D.C. 204, 233 F.2d 695 (1956), that, in the circumstances of that case, existing banks had no standing to challenge the Home Loan Bank Board's issuance of a charter to a proposed savings and loan association. In that case, the complaining banks were relying on a provision of the Home Owners' Loan Act that

"No charter shall be granted * * unless in the judgment of the Board a necessity exists for such an in-

stitution in the community to be served * * * nor unless the same can be established without undue injury to properly conducted existing local thrift and home-financing institutions."

We held that the complaining banks were not "local thrift and home-financing institutions" and so were not protected by the statute from the competition of a lawfully-established federal savings and loan association.

These and similar cases do not apply here because the applicable statutes and the facts of this case are different.[9] For instance, the appellees, Bank of New Orleans and Trust Company and Bank of Louisiana in New Orleans, are state banks having their principal and branch offices in Orleans Parish. They derive substantial volumes of business from the contiguous "east bank" portion of Jefferson Parish but are prohibited by Louisiana law from establishing branches there or in any parish other than Orleans.

They allege that Whitney, with its main office in Orleans Parish but also with substantial business from east Jefferson Parish, is subject to the same restriction as to the establishment of outside branches because 12 U.S.C. § 36(c) makes the Louisiana statute applicable to national banks. The state banks say that thus they have a right, under the combination of federal and state statutes, to be free of the competition in east Jefferson Parish which would result if Whitney of Orleans Parish is allowed to establish branches in east Jefferson where the state law forbids them to go. The state banks allege further that the Comptroller is not authorized to permit, but rather is prohibited by law from permitting, Whitney of New Orleans to establish branches in east Jefferson, and that his unlawful act in doing so would result in illegal competition and a consequent violation of their right, guaran-

---

9. Our decision in Kansas City Power & Light Co. v. McKay, 96 U.S.App.D.C. 273, 225 F.2d 924, cert. denied 350 U.S. 884, 76 S.Ct. 137, 100 L.Ed.2d 780 (1955), for example, involved federal competition sanctioned by Congress, while the competition here is private, and not so sanctioned.

teed by state and federal statutes, to be free of such competition.

The other appellee state bank is in nearby Lafayette Parish and has substantial business from east Jefferson which would be diminished by the unlawful competition of Whitney National's branches.

 Clearly, then, under the allegations of their complaint, the three state banks have standing. It is not enough to say *contra* that the Whitney-Jefferson bank will not be a branch of Whitney-New Orleans and that, therefore, the state banks have no legal right to protection against its establishment and consequently no standing to sue. For, whether or not Whitney-Jefferson will in legal effect be a branch of Whitney-New Orleans is the question tendered for adjudication, upon which under the circumstances the question of standing in part depends. If it is determined that Whitney-Jefferson is not a branch, it might or might not follow that the state banks had no standing—a matter on which we need not pass; but if it is held to be tantamount to a branch purporting to have been federally authorized, their standing would be indubitable.

 Nor is it an answer to say that the state banks may utilize the holding company device to enter east Jefferson Parish, just as Whitney-New Orleans is attempting to do. Regardless of whether Act 275 of the 1962 Louisiana legislature is a direct prohibition against the opening of the new Whitney-Jefferson, unquestionably it effectively prevents the appellee state banks from opening new banks in Jefferson Parish through the medium of holding companies or otherwise. So, the complaint is that the Comptroller has permitted Whitney-New Orleans to organize a new branch in east Jefferson through the use of a holding company device which Louisiana law forbids a state bank to employ, and is about to authorize its opening.

The distinction between this case and those cited by the Comptroller as to standing to sue was carefully drawn by the Supreme Court in Alabama Power Co. v. Ickes, supra, 302 U.S. at page 484, 58 S.Ct. at page 306, 82 L.Ed. 374 (one of his citations), when it said:

"Frost v. Corporation Commission, 278 U.S. 515, 49 S.Ct. 235, 73 L.Ed. 483, relied upon by petitioner, presents an altogether different situation. Appellant there owned a cotton-ginning business in the city of Durant, Oklahoma, for the operation of which he had a license from the corporation commission. The law of Oklahoma provided that no gin should be operated without a license from the commission, which could be obtained only upon specified conditions. We held that such a license was a franchise constituting a property right within the protection of the Fourteenth Amendment; and that while the acquisition of the franchise did not preclude the state from making similar valid grants to others, *it was exclusive against an attempt to operate a competing gin without a permit or under a void permit.* The Durant Co-operative Gin Company sought to obtain a permit from the commission which, for reasons stated in our opinion, we held would be void and a clear invasion of Frost's property rights. *We concluded that a legal right of Frost to be free from such competition would be invaded by one not having a valid franchise to compete,* and sustained Frost's right to an injunction against the commission and the Durant company. See Corporation Commission v. Lowe, 281 U.S. 431, 435 [50 S.Ct. 397, 74 L.Ed. 945]. *The difference between the Frost case and this is fundamental; for the competition contemplated there was unlawful while that of the municipalities contemplated here is entirely lawful.*" (Emphasis supplied.)

Although the Frost case is not factually identical with this one, it is sufficiently similar to be dispositive of the question of standing. The charters of

the appellee banks, granted by the State of Louisiana, are guarded by a combination of specifically applicable federal and state statutes. The appellee banks cannot complain of lawful competition from other lawfully chartered state or national banks because their own charters are not exclusive licenses. But where, as here, the threatened competition arises from an allegedly illegal facility, the appellee state banks have standing to invoke the jurisdiction of a federal court to challenge the alleged unlawful federal administrative action which admittedly would result in irreparable injury to their property rights in their charters.

■ The Comptroller asserts he has discretion as to whether to issue a Certificate of Authority to a new national bank which cannot be judicially controlled. The same contention was made in Commercial State Bank of Roseville v. Gidney, 174 F.Supp. 770 (D.C.D.C.1959), where two state banks within two and one-half miles of a proposed national bank branch sought to enjoin the then Comptroller from authorizing the unlawful competition which threatened them with immediate and irreparable injury. Uncontroverted affidavits showed that the town of Clinton, site of the proposed branch, could not itself support the new facility, which would therefore necessarily draw its business from the surrounding communities already served by the complaining state banks. District Judge Youngdahl brushed aside the Comptroller's discretion argument by saying, at page 778:

> "Defendant argues that the approval or disapproval of branches of national banks is a matter clearly committed to the *discretion* of the Comptroller. But there is *no discretion* in the Comptroller to approve the establishment of a branch office at a location prohibited by law. * * * In the instant case, there is

no desire to control the defendant's discretion * * *. But, as mentioned above, there is *no discretion* to unlawfully issue a certificate. * * * " (Emphasis added.)

We affirmed Judge Youngdahl's decision. 108 U.S.App.D.C. 37, 278 F.2d 871 (1960).

In the case of National Bank of Detroit v. Wayne Oakland Bank, 252 F.2d 537, at page 544, cert. denied 358 U.S. 830, 79 S.Ct. 50, 3 L.Ed.2d 69 (1958), the Sixth Circuit said:

> " * * * The district court found, as a fact, that the competition resulting from the opening and operation of a branch by the National Bank of Detroit would certainly cause inestimable damage to The Wayne Oakland Bank. Whether the rights of a party are infringed by unlawful action of an individual or by exertion of unauthorized federal administrative power, it is entitled to have such controversy adjudicated."

Judge Tamm of our District Court held in Wisconsin Bankers Association v. Robertson, 190 F.Supp. 90 (1960), that national and state banks of Wisconsin collectively have the exclusive right to conduct the business of banking in that state, which gave them standing to challenge alleged competition in that business by federal savings and loan associations.[10]

In sum, we have no doubt that the three state banks [11] had standing to sue the Comptroller in this action in order to test the legality of his proposed action. This conclusion makes it unnecessary to decide whether the Louisiana State Bank Commissioner had standing to sue.

We turn to the question on the merits: whether the District Court was correct in permanently restraining and enjoining

10. We affirmed; no cross appeal was filed. 111 U.S.App.D.C. 85, 294 F.2d 714, cert. denied 368 U.S. 938, 82 S.Ct. 381, 7 L.Ed.2d 338 (1961), rehearing denied 368 U.S. 979, 82 S.Ct. 477, 7 L.Ed.2d 441 (1962).

11. The District Court's finding of fact No. 18 showed their irreparable injury.

the Comptroller from issuing a Certificate of Authority to Whitney-Jefferson. If Whitney-Jefferson, in its organization, management and operation, would be to all intents and purposes a branch of Whitney-New Orleans forbidden by 12 U.S.C. § 36(c), the authority of the District Court to enjoin him from issuing a Certificate of Authority is quite clear.

Since Whitney-Jefferson clearly is not an affiliate, the question is whether the elaborate and ingenious scheme of reorganization devised by Whitney-New Orleans results in what is in reality the establishment of a branch of Whitney-New Orleans in east Jefferson Parish, in violation of federal law.

■ There was actually no pretense about the matter: Whitney of New Orleans frankly proposed to evade the statutes by establishing through the holding company arrangement an office in east Jefferson Parish which it would manage and control. Its president said on October 27, 1961, in his communication to Whitney-New Orleans stockholders which explained in detail the plan of reorganization:

"The basic purpose of the program is to allow the Whitney organization in New Orleans to commence a Holding Company operation controlling a bank in East Jefferson Parish to protect Whitney's competitive position in that area into which many of Whitney's present customers have moved."

On October 28, 1961, he wrote to his stockholders:

" * * * From the depositors [*sic*] point of view, those in the smaller bank will be assured of the *same management* which directs the larger one without possibility of interruption. They will be assured of access to the large loan limits of *the combined banks*. They will have the security which arises out of the fact that *the large and the small bank have identical ownership as well as management*.

\* \* \* \* \* \*

"From the customer point of view there will be no conflict of interest arising out of the manner in which the customer sees fit to divide his business between the commonly owned banks in the two parishes. *He will have the full benefits of a relationship with the large bank* and its officers.

"Because of *the permanent relationship* between the large and the smaller bank, the smaller one can operate safely with a smaller capitalization." (Emphasis supplied.)

This is a very good description of a branch banking operation, regardless of the fact that Whitney's president did not denominate it as such. The nature of the arrangement, and not the label applied to it, determines the character of the relationship between two banking institutions. In 12 U.S.C. § 36 Congress gave a broad meaning to the word "branch":

"(f) The term 'branch' as used in this section shall be held to include *any branch bank, branch office, branch agency, additional office, or any branch place of business* located in any State * * * at which deposits are received, or checks paid, or money lent." (Emphasis supplied.)

The Board of Governors of the Federal Reserve System, although it approved the application of Whitney Holding Corporation to acquire the capital stock of Whitney-New Orleans and Whitney-Jefferson, was under no illusion as to the true nature of the transaction. It said:

"Under the law of Louisiana, a bank may not establish branches outside of the parish in which its head office is situated. * * *

\* \* \* \* \* \*

" * * * *The stated purpose of the proposed holding company system is to enable an organization centered about Whitney New Orleans to provide banking services not only through its existing 12 offices within the City of New Orleans but also*

*through offices in the East Bank of Jefferson Parish.* The holding company system will be under the direction of the present executive management of Whitney New Orleans; *in fact, for present purposes the holding company itself is simply the means by which Whitney banking offices may be established and operated in East Bank.* Consequently, the character of the management and the prospects of the Applicant and its two proposed subsidiary banks may be evaluated largely on the basis of the financial history and condition, character of the management, and prospects of Whitney New Orleans.

"The financial history of Whitney New Orleans has been satisfactory. The condition of that bank is sound and its management is regarded as satisfactory. Accordingly, it is believed that the management of Applicant and Whitney Jefferson will be satisfactory and the prospects of the holding company, *which depend principally upon the prospects of Whitney New Orleans,* are favorable.

 \* \* \* \* \* \*

"\* \* \* *The management and policies of the holding company system, it appears, would be equivalent to those of Whitney New Orleans.* \* \* \*" (Emphasis supplied.)

The Board of Governors said, however, in denying the protestants' petition for reconsideration of its approval of Whitney Holding's application:

"\* \* \* [T]hey [the arguments for reconsideration] relate largely to an alleged violation of provisions of the National Bank Act, which is ad-

ministered by the Comptroller of the Currency \* \* \*." [12]

Whitney-New Orleans's purpose of evading federal and state statutes forbidding branch banking in Louisiana beyond parish lines was known to the Comptroller when he approved the arrangement. His affidavit, which is in the record states:

"\* \* \* [T]he Whitney National wished to explore with the Comptroller whatever legal means were available for a like expansion into this growing area, which needs additional banking facilities. The formation of an affiliate bank was discussed and the formation of a holding company was also discussed. The bank management felt that a holding company which would own 100% of the stock of both the old bank and the new bank would be preferable to the formation of an affiliate of which the controlling stock would be held by the same persons who control Whitney New Orleans, but which, in view of the wide stock distribution of Whitney New Orleans, would invariably have a minority of stockholders who did not own stock in both banks. The existence of the minority stock interest in each bank, which did not hold corresponding shares in the other, was considered by the Whitney management to be an undesirable situation because it could conceivably hamper the most efficient and effective day-to-day operation of the two banks. Since the same group would be managing both banks, it was thought that situations could arise in which it would be impossible for

12. This paragraph containing the excerpt last quoted above is as follows:

 "The Board has considered the reasons advanced in the Petition for Reconsideration. To a considerable extent, these are based upon allegations that the Whitney Reorganization Program was not in conformity with applicable provisions of Federal statutes. It is also alleged that the Board's action 'will unnecessarily place into the hands of fed-

erally chartered banks a powerful and unfair competitive advantage over State banks \* \* \*.' In the judgment of the Board, those arguments are without substantial merit. In addition, they relate largely to an alleged violation of provisions of the National Bank Act, which is administered by the Comptroller of the Currency, an official of the United States Treasury Department."

the interests of two different groups of minority stockholders to be fully protected. For this reason, the Whitney management, as was their right and prerogative elected to use a holding company for the purpose of establishing a new bank in Jefferson Parish.

"At all times the applicable Louisiana statutes forbidding the establishment of branch offices across parish lines were fully considered and there was no suggestion that the formation of a holding company would be in any way clandestine or evasive. * * *"

The Comptroller states in his brief:

"* * * [T]he Ninth Circuit has, in a case substantially on all fours with one at bar, recently rejected an attempt to hold the branch banking prohibitions of 12 U.S.C. 36 applicable to an affiliate of a bank holding company. First Nat. Bank of Billings v. First Bank Stock Corp., 306 F.2d 937 (C.A.9 [1962]) * *."

The Billings case is far from being factually "on all fours" with the present case. There the bank holding company was organized in 1929, and had been operating in that capacity for 30 years. It possessed stock in 87 banks with 94 offices. Thus, it was not created or organized by a bank, as Whitney Holding was, solely for the purpose of opening a branch office of that bank. It was the traditionally recognized bank holding company which, with its own capital, invests in or buys the stock of banks. It was not the type of holding company here involved, whose only capital was the money siphoned through it by Whitney-New Orleans to open Whitney-Jefferson in a prohibited location.

■ And the Billings opinion says, at page 942:

"* * * What must appellants show, to establish that Valley is such a branch? They must show, that, in substance, Midland is doing business through the instrumentality of Valley, or vice versa, in the same way

as if the institutions were one. (Cf. Camden Trust Co. v. Gidney, D.C. Cir., 1962, [112 U.S.App.D.C. 197] 301 F.2d 521) We do not agree with appellees that the fact that the two banks are separate corporate organizations demonstrates conclusively that one is not a branch of the other. In the banking field, as elsewhere, courts have power to 'pierce the corporate veil' when the realities require it."

We agree with the Ninth Circuit that the corporate veil should be pierced whenever one bank is "doing business through the instrumentality of" the other or "in the same way as if the institutions were one." "The unitary type of operation," said in the Billings opinion to be "characteristic of branch banking," is present here. In such circumstances, the relation of parent and branch exists, even though the banks are separate corporate organizations.

The facts already recited sufficiently show, we think, that Whitney-New Orleans intends to do business through Whitney-Jefferson in the same way as if the institutions were one. The president of Whitney-New Orleans frankly made this quite clear. We recite some of his statements: On June 28, 1961, in submitting to the Comptroller applications to organize Crescent City and Whitney-Jefferson and to consolidate Crescent City with the original Whitney-New Orleans, Whitney's president said:

"These applications form part of an overall plan for the operation in the Parish of Orleans and in the Parish of Jefferson of the Whitney organization in holding company form."

On October 27, 1961, he advised his shareholders that

"The basic purpose of the program is to allow the Whitney organization in New Orleans to commence a Holding Company operation controlling a bank in East Jefferson Parish to protect Whitney's competitive position in that area into which many of

Whitney's present customers have moved."

Addressing them on October 28, 1962, he spoke of Whitney-New Orleans and Whitney-Jefferson as "the combined banks," said the large and small banks will "have identical ownership as well as management," and referred to the organization plan as a "method of pooling all of the deposits of our customers and of our capital funds * * *." And, as we have pointed out, the Board of Governors of the Federal Reserve System said "the holding company itself is simply the means by which Whitney banking offices may be established and operated in East Bank [east Jefferson Parish]."

■ Consequently, we pierce the corporate veil which shrouds this intricate transaction, and see Whitney-New Orleans attempting to establish a branch in Jefferson Parish in violation of 12 U.S.C. § 36(c). It is a bootstrap operation by which Whitney-New Orleans, using its own funds in corporate maneuvering, seeks to establish a branch in prohibited territory. Like Jacob of old, Whitney-New Orleans covered its hands with the Esau-like plan of reorganization and, despite the telltale sound of its own voice, obtained the blessing of the Comptroller of the Currency. Unlike Isaac, however, the Comptroller was not gulled by the ruse; acting *ultra vires* in the circumstances shown, he knowingly permitted it because he considered the end desirable, and because he thought the corporate maneuvering impervious to attack. But, when the corporate veil is pierced, it becomes apparent that both voice and hands were those of Whitney-New Orleans.

The Comptroller contends that the reasoning and holding of our Camden Trust opinion [13] are controlling here. We do not agree. Whitney of New Orleans considered the "affiliate" arrangement we approved in the Camden case, and decided not to use it because it does not permit the identity of ownership provided by the holding company device, and because it does not assure that even the permitted affiliation will remain constant.

Quite unlike the sum total of the several factors which led us to approve the "affiliate" status in the Camden Trust situation, we need observe only that here, *inter alia*, the holding company is not providing Whitney-Jefferson with new and fresh capital, but with capital supplied by Whitney-New Orleans; the new bank will be managed and controlled by the executives of Whitney-New Orleans; and the name, Whitney National Bank in Jefferson Parish (the last three words in small letters on its checks and other forms), is easily susceptible of confusion with the parent organizer,[14] The Whitney National Bank of New Orleans.

We are unwilling to extend the holding of the Camden Trust case to cover a situation such as that presented here. We think it clear that the opening of Whitney-Jefferson is prohibited by 12 U.S.C. § 36 and that, consequently, the Comptroller was properly enjoined from issuing a Certificate of Authority for it to begin business. It is therefore unnecessary for us to decide whether the opening is also prohibited by Act 275 of the Louisiana legislature.[15]

Affirmed.

13. Supra, note 3.

14. On June 28, 1961, the Whitney-New Orleans mailed to the then Comptroller of the Currency the following:
 1. An application to organize the Crescent City National Bank.
 2. An application to organize Whitney National Bank in Jefferson Parish.
 3. An application for approval to consolidate the Crescent City National Bank with the present Whitney National Bank of New Orleans.

At that time, Whitney Holding Corporation had not been incorporated, so it was not the organizer of Whitney-Jefferson.

15. If so, the actual opening of Whitney-Jefferson would violate the state statute even if the Comptroller had already issued his Certificate of Authority, for Act 275 forbids the opening "whether or not, a charter, permit, license or certificate to open for business has already been issued."