

# THE ATTORNEY GENERAL

## OF TEXAS

CRAWFORD C. MARTIN
ATTORNEY GENERAL

AUSTIN, TEXAS 78711

August 22, 1968

Honorable Robert E. Stewart                    Opinion No. M-273
Deputy Commissioner
Department of Banking
John H. Reagan State Office Building
Austin, Texas 78711                            Re:  Branch Banking;
                                                    Machines for the
                                                    purpose of accept-
                                                    ing and receipting
                                                    off-premises bank
Dear Mr. Stewart:                                   deposits.

        In connection with your request for an opinion on
whether Texas banks may use off-premise machines for the
purpose of accepting and receipting off-premise bank de-
posits, you state that machines for accepting and receipt-
ing off-premises bank deposits are currently in use in
Arizona and possibly elsewhere.

        Under one plan of service about which you inquire,
a national bank in Arizona contracts with owners of such
machines to place them in selected locations in the bank-
ing area.  The bank retains the owner to lease, service,
and supply the machines, and to pick up and deliver de-
posits from the machines to the bank.  In this regard, the
owner purports to act as an outside independent contractor
and to "absolve the bank" from any direct connection with
the operation, maintenance and collection from the machines.
The deposits are accepted in the machine by its owner who
purports to act as agent for the depositor.  The machine
owner carries insurance covering the equipment and deposits
until their delivery to the bank.  A special bank deposit
receipt is used which specifies that the deposit has been
received by the machine owner for deposit in the bank.

        Deposits are collected daily by an armored car ser-
vice retained by the machine owner for delivery to the
bank, and the deposits are not designated as being officially
"in the bank" until so delivered to the bank.  In making
the delivery, the machine owner purports to act as agent
for the depositor and not for the bank.  Time of collection
is posted at the machine.  The physical locations for the

machines in shopping centers and elsewhere are negotiated not
by the machine owner or operator but by the participating
bank.

Your inquiry relates to whether the above described plan
is permissible to state and national banks in Texas.

A national bank has offered additional or alternative
proposals to see if the Department of Banking would challenge
either or both. Under alternate plan (1), the bank would
own (or lease from the distributor, in the bank's name),
these deposit boxes. The bank's name would be prominently
displayed on the boxes where ever they are placed, but
there would be a form of notification at some place on the
box that the bank is not actually accepting any deposit
until the deposited items are presented at the bank. Simi-
lar language and notice would be printed on the deposit
ticket or receipt received by the depositor from the machine.
The bank would employ personnel to service the boxes and to
pick up and transfer to the bank any items therein. Also,
the bank's fidelity and theft insurance coverage would ex-
tend to items placed in the box and would pay any loss sus-
tained by a deposit customer through employee defalcation
or through robbery.

Alternate plan (2) provides that the boxes would be
owned or leased from the distributor by a third party
(in this specific case, the bank's stockholder company.)
The bank would contract with this third party for the place-
ment of the machines in various locations. The owner would
be responsible for servicing the boxes and for pick-up
and delivery of items deposited therein to the bank. Lan-
guage concerning the bank's acceptance of the deposit only
upon receipt at its banking house would be located on the
boxes and on the deposit ticket issued to the depositor,
and it would be stated that the box owner would be acting
in the capacity of agent for the depositor. The insurance
against loss would be provided by the bank, however, as in
the other alternate plan.

Your inquiry relates also to whether such alternate
plans (1) and (2) are permissible to state and national
banks in Texas.

A state bank has asked your office whether such machines
would be legal for use if the boxes are owned or leased

from the distributor by a third party (probably the bank's stockholder company), serviced by that third party, and insured against loss by the third party. The bank would contract with the owner for placement of the machines, and the bank's name would be prominently displayed on the face of the machine. There would be notification to depositors, however, on the face of the machine and on the deposit receipt issued to the depositor that the owner is acting as agent for the depositor and that the bank will not give credit for deposits made in the machines until the items are received at the banking house. The machine owner would accept full responsibility for items deposited therein and would provide fidelity and robbery insurance from the time items are placed in the machine until delivery is made to the banking house.

You have inquired also as to whether the immediately preceding proposal by the state bank is permissible to state and national banks in Texas.

Your precise questions have been stated as follows:

"(1) Can the bank own or lease in its own name these machines, and provide fidelity insurance protection?

"(2) Can the bank contract with a third-party owner, but provide insurance protection?

"(3) Can the bank contract with a third-party owner as above, if the third party provides the insurance protection?

"(4) Can bank personnel be used in the servicing, or pick-up and delivery of items deposited?

"(5) Can bank personnel be employed at the site of the machines to assist depositors in their use of the machines?"

Pursuant to the discussion set out below, your questions 1 through 5 are answered in the negative, and you are advised that not any of the various proposals summarized above are compatible with state law.

The extent, if any, to which branch banking will be permitted within the various states is a matter which is principally within the control of the individual states. Each state is, of course, permitted to decide for itself whether banks operating under state charters will be permitted to branch; and with regard to nationally chartered banks, the Federal Congress has provided that such restrictions as pertain to branching by banks chartered by the states also apply to national banks operating within such states. Section 36(c) of the National Bank Act (12 U.S.C. § 36(c)) provides, in part:

> "A national banking association may, with the approval of the Comptroller of the Currency, establish and operate new branches: (1) Within the limits of the city, town or village in which said association is situated, if such establishment and operation are at the time expressly authorized to State banks by the law of the State in question; and (2) at any point within the State in which said association is situated, if such establishment and operation are at the time authorized to State banks by the statute law of the State in question by language specifically granting such authority affirmatively and not merely by implication or recognition, and subject to the restrictions as to location imposed by the law of the State on State banks."

The Texas Constitution, Article XVI, Section 16, provides for the supervision, regulation and control of corporate bodies with banking and discounting privileges. It has been expressly stated therein that such corporate bodies ". . . shall not be authorized to engage in business in more than one place . . ."

Article 3, Chapter IX of the Texas Banking Code (Article 342-903, Vernon's Civil Statutes), which was enacted pursuant to the quoted constitutional prohibition, provides:

> "No state, national or private bank shall engage in business in more than one place, maintain any branch office, or cash checks or receive deposits except in its own banking house. For purpose of this Article 'banking house' means the building

in whose offices the business of the bank
is conducted and which is functionally one
place of business, including office facilities
whose nearest wall is located within five
hundred (500) feet of the nearest wall of the
central building and is physically connected
to the central building by tunnel, passage-
way or hallway providing direct access be-
tween the central building and the connected
office facility or by pneumatic tube or other
similar carrier. The entire banking house
shall for all purposes under the law be con-
sidered one integral banking house."

From the above quoted prohibitions, it is clear that
Texas law does not favor the use of multiple banking
facilities by a single banking institution. Accordingly,
it is the opinion of this office that Texas law would not
permit the implementation of any of the various proposals
hereinabove set forth.

You have requested that we relate our discussion to the
following ruling issued in 1965 by the Comptroller of the
Currency, to-wit:

"7491.  Deposit Machines

"A national bank may utilize at any location
a machine which receives checks, currency, or
coin for deposit. The machine shall provide
documentary evidence of the transaction which
states that the transaction will become a de-
posit upon verification and crediting at the
main office or a branch office of the bank.
Utilization of such machines at locations other
than the main office or a branch office of the
bank does not constitute branch banking. A
bank may provide insurance protection under its
bonding program for transactions involving such
machines."

The above quoted ruling has not yet been passed upon by
the courts, and the Comptroller of the Currency has cited no
legal authority in support thereof. The Administrator's recent
rulings with regard to branch banking facilities have been
said to be largely without supporting statutory authority

and open to serious question.  See 32 University of Chicago Law Review 148; 31 Law and Contemporary Problems 749, 765, and cases cited.

In our opinion, no substantial difference exists between that plan approved by the above quoted ruling and any other plan which may be designed for the acceptance of bank deposits in branch locations.  The use of a mechanical contrivance to perform these operations will not render them non-banking operations which are outside the general and usual rules governing and restricting branch banking.  "Branching" is defined by both state and federal law in terms of end results and not in terms of any instrumentality or agency by which such results are accomplished.  Section 36(f) of the National Bank Act (12 U.S.C. § 36(f)) provides, in part:

> "The term branch as used in this section shall be held to include any branch bank, branch office, branch agency, additional office, or any branch place of business located in any state . . . at which deposits are received, or checks paid, or money lent."

In a recent federal decision, it was observed in connection with the above quoted federal definition of "branching":

> ". . .'/A_7n additional office' or 'branch place of business' will be considered a 'branch' for the purposes of § 36 if any one of the three specified conditions is met, i.e., if deposits are received or checks are paid or money is lent." Jackson v. First National Bank of Valdosta, 246 F. Supp. 134, 138 (M.D. Ga. 1965).  (Original emphasis.)

Those plans which have been proposed which would designate third parties to be the operator(s) of the machines are likewise subject to attack on several fronts.

Initially, we observe with respect to these so-called "independent contractor arrangements" that from the manner in which these plans have been formulated and proposed, it is clear that the end result sought is a branch banking operation over which the parent bank will retain the maximum possible actual control which can be exercised and re-

tained consistent with the theory or pretense that legal control is elsewhere. Legal control is sought to be vested in a separate corporation solely for the purpose of circumventing the restrictions on branch banking operations as they may apply to restrict the parent bank. Such an arrangement may be held to be, in and of itself, a sufficient basis for attacking the agreement between the bank and "the third party independent contractor." See 1 Fletcher, Corporations (1963 revised ed.) 240, 241, wherein it is concluded that,

> "Where the corporate form of organization is adopted or a corporate entity is asserted in an endeavor to evade a statute or to modify its intent, courts will disregard the corporation or its entity and look at the substance and reality of the matter."

The above stated principle has been recognized and applied in numerous fact situations and has been held to extend to the use of separate corporations created for the sole or main purpose of circumventing prohibitions against branch banking. Whitney National Bank of Jefferson Parish v. Bank of New Orleans, 323 F 2d 290 (D.C. Cir. 1963), reversed on other grounds 379 U.S. 411, 13 L.ed2d 386, 85 S.Ct. 551 (1965). In the Whitney National Bank case, supra, the Washington D.C. Circuit Court of Appeals wrote, in part at 323 F 2d 303:

> "... /T_/he corporate veil should be pierced whenever one bank /or corporation_/ is doing business through the instrumentality of the other or in the same way as if the institutions were one. The unitary type of operation said ... to be characteristic of branch banking is present here. In such circumstances the relationship of parent and branch exists, even though the banks are separate corporate organizations."

The application of legal terminology or language which would in form designate the owner or operator of the machines the agent of the depositor of the bank is of no legal significance, nor would there be any legal significance to the creation of a dual agency relationship. Such fictional arrangements will not alter the actual situation, since the

courts look to substance rather than mere form.

In our opinion the facilities described in your letter are clearly banking facilities. It is equally clear that under each proposed arrangement which you have described for operating these facilities, the party operating the same would be doing so largely for the benefit of the bank and as agent of the bank, regardless of protestations to the contrary. It is our opinion that under each proposed arrangement the participating bank would in effect be "engaging in business at more than one place" in violation of the applicable provisions of State and Federal Law.

Secondly, even if it could be concluded that the third party who operates the machines is not the agent of the participating bank, such third party would himself be engaging in the banking business without a charter in violation of Section 902 of the Banking Code (Article 342-902, V.C.S.). The provisions of the Texas Constitution and statutes contemplate the regulation of the banking business from the very instant that public money is deposited. The device here proposed, if held not to be subject to these provisions, would leave the public completely unprotected, insofar as "supervision, regulation and control" are concerned from the time that the deposit is made with the "box" until the deposit reaches the confines of the participating bank.

## S U M M A R Y

(1) The use of machines to perform acts which would otherwise constitute branch banking within the prohibitions of State law (as made applicable to national banks by Congress) has no legal effect insofar as the nature of such acts are concerned, -- said acts continue to constitute branch banking.

(2) The use of an "independent contractor" arrangement with the owner or operator of such machines for the attempted purpose of circumventing prohibitions against branch banking should be disregarded and the substance of the arrangement (the participating interest of the bank) should be looked to to determine whether the bank is in fact engaging in branch banking.

(3) To such extent, if any, as the third party is in fact a separate entity or independent contractor he would himself be engaging in unregulated banking in violation of state law.

Yours very truly,

CRAWFORD C. MARTIN
Attorney General of Texas

Prepared by Larry J. Craddock
Assistant Attorney General

APPROVED:
OPINION COMMITTEE

Hawthorne Phillips, Chairman
Kerns Taylor, Co-Chairman
Fielding Early
Jim Swearingen
Fisher Tyler
Malcolm Quick

A. J. Carubbi, Jr.
Executive Assistant Attorney General