420 F.2d 83
 136 U.S.App.D.C. 241, Fed. Sec. L. Rep. P 92,438
 NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC., Petitioner,
v.
SECURITIES AND EXCHANGE COMMISSION, Respondent, First
National City Bank, Intervenor.
FIRST NATIONAL CITY BANK, Appellant,
v.
INVESTMENT COMPANY INSTITUTE et al., Appellees.
COMPTROLLER OF the CURRENCY, William B. Camp, Appellant,
v.
INVESTMENT COMPANY INSTITUTE et al., Appellees.
 Nos. 20164, 21661, 21662.
 United States Court of Appeals District of Columbia Circuit.
 No. 20164 Argued Jan. 4, 1967. Nos. 21661-2 Argued Nov. 27, 1968.
Decided July 1, 1969, Petitions for Rehearing Denied Aug.
15, 1969, CertiorariGranted March 23, 1970, See 90
S.Ct. 1114.
 
 Mr. Joseph B. Levin, with whom Mr. Marc A. White, Washington, D.C., was on the brief, for petitioner in No. 20,164.
 Mr. Archibald Cox, Washington, D.C., with whom Mr. Stephen Ailes, Washington, D.C., was on the brief for appellant in No. 21,661.
 Mr. Alan S. Rosenthal, Atty., Department of Justice, with whom Asst. Atty. Gen. Edwin L. Weisl, Jr., Messrs. David G. Bress, U.S. Atty. at the time the brief was filed, and Robert C. McDiarmid, Atty., Department of Justice, were on the brief, for appellant in No. 21,662. Mr. Irwin Goldbloom, Atty., Department of Justice, also entered an appearance for appellant in No. 21,662.
 Mr. John A. Dudley, Asst. Director, Division of Corporate Regulation, Securities and Exchange Commission, with whom Messrs. Philip A. Loomis, General Counsel, David Ferber, Solicitor, and Leonard S. Machtinger, Atty., Securities and Exchange Commission, were on the brief, for respondent in No. 20,164.
 Mr. G. Duane Vieth, with whom Mr. Charles R. Halpern, Washington, D.C., was on the brief, for appellees in Nos. 21,661 and 21,662. Mr. Melvin Spaeth also entered an appearance for appellees in Nos. 21,661 and 21,662.
 Mr. Samuel E. Gates, New York City, with whom Mr. Stephen Ailes, Washington, D.C., was on the brief, for intervenor in No. 20,164. Mr. Henry C. Ikenberry, Jr., Washington, D.C., also entered an appearance for intervenor in No. 20,164.
 Before BAZELON, Chief Judge, WILBUR K. MILLER, Senior Circuit Judge, and BURGER, Circuit Judge.
 PER CURIAM:*
 
 
 1
 In these appeals the mutual fund industry levels a two-pronged attack on a national bank's authority to operate a collective investment fund as a service of its trust department. The fund is a commingled managing agency account, similar in most respects to an open-end mutual fund. First National City Bank's Commingled Investment Account (the Account) and other bank-sponsored funds likely to follow will compete with mutual funds and with those who market their shares. Competitors claiming that the Account is unlawful are the Investment Company Institute (ICI), an association of mutual funds and their investment advisers and underwriters; and the National Association of Securities Dealers (NASD), whose members sell shares in open and closed-end mutual funds.
 
 
 2
 The Account was registered with the Securities and Exchange Commission as an investment company under the Investment Company Act of 1940, 15 U.S.C. 80a-1 et seq., and approved by the Comptroller of the Currency as a bona fide fiduciary activity authorized for national banks by 92a of the Federal Reserve Act of 1913, 12 U.S.C. 92a. The NASD intervened before the Securities and Exchange Commission to oppose the grant to the Account of exemptions from certain provisions of the Investment Company Act, and now seeks to set aside the Commission's orders granting them.[1] The ICI sued the Comptroller of the Currency and First National City Bank (the Bank) in the United States District Court for the District of Columbia for a declaratory judgment invalidating so much of the Comptroller's Regulation 9, 12 C.F.R. 9.18, as permits national banks to operate this type of account. Upon crossmotions for summary judgment, the District Court invalidated portions of the regulation and required the Comptroller to rescind approval of the Account. Investment Company Institute v. Camp, 274 F.Supp. 624 (1967). From that judgment, the Comptroller and the Bank appeal.
 
 
 3
 Each appeal raises difficult questions of competitors' standing. While a majority of the court has reservations about standing, these doubts have been resolved in favor of reaching the merits in cases of this consequence. On the merits, we are agreed that the actions taken by the Securities and Exchange Commission and the Comptroller are fully consonant with the statutes committed to their regulatory jurisdictions. Accordingly, we affirm the orders of the Securities and Exchange Commission and reverse on the merits the judgment of the District Court in favor of the Investment Company Institute. It is so ordered.
 
 
 4
 The opinion of Judge BURGER, in which Judge MILLER concurs, and the opinion of Chief Judge BAZELON, which follow, set forth the reasons for our action:
 
 BAZELON, Chief Judge (concurring):
 
 5
 First National City Bank's plan to operate a collective investment fund has generated complex and controversial issues for resolution by the Comptroller of the Currency and the Securities and Exchange Commission. Because this innovation in banking will create massive competition for the mutual fund industry, its members have brought the dispute to court. For the reasons stated at the conclusion of this opinion, I believe that representatives of the mutual fund industry have standing to adjudicate the important legal questions aired at length before the administrative agencies.
 
 
 6
 On the merits, the cases together present an interplay of administrative decisions designed to serve different but complementary regulatory aims. The Bank's plan straddles two sets of statutes. The result is a complicated, if sometimes awkward, accommodation of the requirements of each. Petitioners below claim that this accommodation compromises the vital protection to investors and bank customers afforded by the securities and banking laws, and creates a dangerous blend of securities dealing and commercial banking. From an analysis of the relevant statutes and their legislative history, I conclude that the Account, subject to the mutually reinforcing regulations imposed by the Comptroller and the Commission, was established in accordance with law.
 
 
 7
 * INTRODUCTION
 
 
 8
 Since 1962, the Comptroller has exercised authority under 92a of the Federal Reserve Act to grant national banks, by special permit, the authority to exercise trust and other fiduciary powers,[1] namely:
 
 
 9
 * * * to act as trustee, executor, administrator, registrar of stocks and bonds, guardian of estates, assignee, receiver, committee of estates of lunatics, or in any other fiduciary capacity in which State banks, trust companies, or other corporations which come into competition with national banks are permitted to act under the laws of the State in which the national bank is located.
 
 
 10
 Section 92a(j) authorizes the Comptroller to issue such rules as he deems necessary to enforce the proper exercise of those powers. In April 1963 the Comptroller issued revised Regulation 9, 12 C.F.R. 9.18, which authorized for the first time the commingling of managing agency accounts under national banks' fiduciary powers.
 
 
 11
 The background of Regulation 9 needs brief mention. Since the thirties, banks have been authorized to act as managing agents to purchase and sell stock for a single principal, 1934 Fed.Reserve Bull. 609, but the cost of bank management made it prohibitive to offer this service to investors without very substantial assets. For example, the Bank's minimum for an individual managing agency account is $200,000. Prior to 1963, national banks were authorized by the Federal Reserve Board to commingle and invest customers' funds only if held in its capacities as trustee, executor, administrator, or guardian, and funds held as part of a tax-exempt pension and profit sharing or stock bonus plan of employers for the benefit of employees. Regulation F, 12 C.F.R. 206 (1959 Rev.). The Federal Reserve Board, moreover, had consistently taken the view that common trust funds should not be used as a medium to attract customers primarily seeking investment management of their funds.[2] After the responsibility for regulating bank trust powers was transferred to the Comptroller, that office concluded, after study, that existing regulations should be broadened to extend the advantages of collective investment to managing agency accounts.
 
 
 12
 The Bank proposed the establishment of a commingled managing agency account pursuant to the revised regulation.[3] Under the Bank's plan, a customer deposits a minimum of $10,000 under a broad authorization permitting the Bank to invest the funds with those of other participants in the plan. The customer is a principal, and the Bank, his managing agent. The customer receives an undivided interest in the fund, expressed as a 'unit of participation.' These units are redeemable at net asset value, and are not transferable except to other participants in the plan. No sales load or redemption charge can be imposed.
 
 
 13
 The Account is registered as an investment company under the Investment Company Act, and the units of participation are registered as securities under the Securities Act of 1933, 15 U.S.C. 77a et seq. (1964). The Bank is both investment adviser to the Account and statutory underwriter for the units of participation issued. The Account is subject to a Committee with the powers of a board of directors, whose members are elected annually by the participants. The Bank sought and received exemptions from provisions in the Investment Company Act which would have required that a majority of the Committee be unaffiliated with the Bank. The Securities and Exchange Commission required that at least two of the five Committee members must be persons unaffiliated with the Bank, but the other three will normally be officers of its Trust and Investment Division.
 
 
 14
 The Account is managed by the Bank pursuant to a management agreement which must be approved by the participants at their first annual meeting. Thereafter, the contract must be approved annually by the participants or by the Committee, including both Committee members unaffiliated with the Bank.
 
 
 15
 The Account is the functional equivalent of an open-end mutual fund, but there are several differences. The Comptroller's regulations provide that the units of participation or shares may not be marketed through regular channels of public distribution; participation is offered and publicized only through the Trust Department. 12 C.F.R. 9.18(b)(5)(iii) and (iv) (1968). The Bank's compensation is limited by regulation to the sum of the fees normally charged for separate management of such accounts, namely, 1/2 of 1 percent per annum of the average net asset value of the fund. 12 C.F.R. 9.18(b)(12). Finally, and most important, the Account is under the supervision of the Comptroller like other banking functions. This includes review of the fund's investments to see that they are in accordance with sound fiduciary principles. 12 U.S.C. 481 (1964), 12 C.F.R. 9.11(d) (1968).
 
 II
 VALIDITY OF THE ACCOUNT UNDER THE BANKING LAWS
 
 16
 The District Court held that the Account is unlawful on two grounds: (1) the commingled managing agency account is not a fiduciary activity within the purview of 92a of the Federal Reserve Act and is not open to State banks under the law of New York, and (2) the maintenance of the fund violates 16, 20, 21, and 32 of the Glass-Steagall Act, 12 U.S.C. 24 (seventh), 377, 378, 78 (1964).
 
 A. The Federal Reserve Act
 
 17
 The District Court relied on the differences between the trustee and agency relationships, noting especially the higher standard of care of a trustee, to conclude that a collective managing agency account was not a true fiduciary activity within the purview of 92a of the Federal Reserve Act. The differences between the traditional trust relationships of trustee, executor, or administrator and the contractual principal-agent relationship do not, in my view, make the agent any less a fiduciary, nor does commingling of funds, subject to the principal's authorization, change the fiduciary character of the duty owed to each. Brown v. Christman, 75 U.S.App.D.C. 203, 126 F.2d 625 (1942). The District Court apparently recognized that the Account might pass muster under the phrase authorizing banks to act 'in any other fiduciary capacity,' but held that it did not qualify as an activity open to competing State banks under the New York law.
 
 
 18
 Section 100-c of the New York Banking Law, McKinney's Consol. Laws, c. 2, specifically authorizes trust companies to commingle funds held in the strict trust capacities, but New York law contains no specific grant of authority to commingle funds held as managing agent. The District Court concluded that the absence of such authority was an implied prohibition. Section 100-c, however, simply permits commingling in cases where the governing trust instrument does not authorize it. The conditions on commingling imposed by 100-c have not been imposed upon collective accounts authorized by a trust instrument. The real question, therefore, was whether commingling was permissible under the general authority of 100, which empowers a State bank to act as agent for any lawful purpose and to manage a principal's funds according to the terms of the power conferred upon the bank. N.Y. Banking Law 100(1) and (5) (McKinney 1950).
 
 
 19
 Since the decision of the District Court, the New York State Banking Department has given formal approval of commingled managing agency accounts to two New York banks, stating that the operation of the accounts is authorized by 100 of the Banking Law. Appellee ICI describes this approval as a defensive response to enable State banks to meet the national banks' competition. This is surely true. Prior to the Comptroller's issuance of revised Regulation 9, no State banks operated commingled managing agency accounts. Still, the Banking Department's action cannot fairly be dismissed as merely following the Comptroller's lead. The question of whether collective accounts are a proper fiduciary activity for banks appears to have been open under both Federal and New York law, and both banking agencies could reasonably have resolved it the same way.
 
 
 20
 The Bank concedes, of course, that the commingling of managing agency accounts represents a departure from past banking practice of limiting commingling to funds held by the bank in the traditional trust capacities and as trustee of a pension or profit-sharing trust. Regulation 9.18 permits banks to serve multiple principals under a standard agreement vesting the bank with broad discretion to invest their money, subject to the duties and liabilities of a managing agent, and not a trustee. This is a new and free-wheeling form of fiduciary activity.
 
 
 21
 I am persuaded, however, that the Comptroller's regulations, together with the protection of the customer qua investor afforded by the securities acts, will reasonably assure the proper exercise of this broad fiduciary power. The restrictions imposed by Regulation 9, 12 C.F.R. 9, secure the Comptroller's powers of examination and supervision of the Account. (9.8, 9.9.) The rules safeguard the fiduciary relationship by requiring the separation of the Account's funds from other assets (9.13, 9.18(b)(2)), by enforcing the obligations to refrain from self-dealing and conflicts of interest (229.10, 9.12, 9.18(b)(8)), and by limiting the Bank's charge to its normal fiduciary compensation 9.15, 9.18(b)(12)).
 
 
 22
 The major difference between the Bank's relationship to the customers of the Account and its relationship to the beneficiaries of other management and trust services is the absence of an individually negotiated agreement. The character of the Bank's initial advice and ultimate accountability to the customer is necessarily altered by a package deal offered to all comers. This was one reason why the Securities and Exchange Commission required registration of the Account.[4] The provisions for disclosure and participant control contained in the securities laws substantially compensate for the drawbacks of a standardized fiduciary service. The Securities Act of 1933 requires that potential customer-investors receive a prospectus describing the management of the Account, its investment objectives and policies, and the rights of participants. 15 U.S.C. 77j (1964). Periodic reports and proxy statements must be issued for inspection by both the participants and the Commission. 80a-20(a) and 80a-29(d). Pursuant to the provisions of the Investment Company Act, participants in the Account will elect their directors (80a-16(a)), retain the power to terminate the contract (80a-15(a)(3)), and ratify the selection of auditors (80a-31(a)(2)). The interests of the principals participating in the Account, though not identical, are bound to be similar; and as a group, they possess a measure of control over the management of their money. Dual regulation by the Comptroller and the Commission should assure the proper operation of the Account.
 
 B. The Glass-Steagall Act
 
 23
 The District Court held that the Comptroller's authorization of the Account violated four provisions of the Glass-Steagall Act. It held that in the issuance of units of participation, the Bank was engaged in the business of dealing in securities for its own account in violation of 16 and 21, and that the relation between the Bank and the account was an affiliation or interlocking directorate between a bank and an organization principally engaged in the securities business in violation of 20 and 32 of the Act.
 
 
 24
 (1) Sections 16 and 21
 
 
 25
 Section 16 of the Glass-Steagall Act imposes the following limitation upon bank dealing in securities:
 
 
 26
 * * * The business of dealing in securities and stock by the (national banking) association shall be limited to purchasing and selling such securities and stock without recourse, solely upon the order, and for the account of, customers, and in no case for its own account, and the association shall not underwrite any issue of securities or stock * * *. (12 U.S.C. 24 (seventh).)
 
 
 27
 Section 21 of the Act prohibits commercial banks from engaging in the business of 'issuing, underwriting, selling or distributing' most types of securi ties.[5] Because the units of participation in the Account are securities, and the Bank is the statutory underwriter under the Securities Act of 1933, the District Court held that the Bank is engaged in the selling and underwriting of securities prohibited by 16 and 21 in operating the Account.
 
 
 28
 The words security and underwriter in the Securities Act of 1933 are terms of art with a high gloss. Their expansive definitions under the Securities Act cannot be imported wholesale into the Glass-Steagall Act when the two statutes serve different purposes, in different contexts of risk to the public. The securities laws are intended to protect investors, primarily through disclosure requirements. Their terms have been interpreted broadly to afford their protection to purchasers of all manner of investment interests, wherever it is needed. The Glass-Steagall Act, by contrast, was enacted to protect bank depositors and the banking system from the risk of insolvency incident to widespread investment of banks' assets in speculative securities during the twenties. Banks frequently not only invested in speculative securities, but entered the business of investment banking by underwriting original issues. Some of these activities were undertaken directly; others were carried on by securities affiliates formed and controlled by the banks to evade completely the weak restrictions upon direct bank dealing in speculative securities. Section 16 of the Act was addressed to three problems:
 
 
 29
 (1) Banks commonly invested their own assets in securities, risking commercial and savings deposits if the securities declined in value.[6]
 
 
 30
 (2) Direct bank investment in securities created pressure for banks to make unsound loans to maintain the price of securities or the financial position of companies in which the bank had holdings.[7]
 
 
 31
 (3) Large city banks frequently acted as issuers, or underwriters of blocks of securities, distributing them at a profit through correspondent country banks. The banks' pecuniary interest in the ownership, price, or distribution of securities created incentive to steer customers into investing in what the banks had to sell.[8]
 
 
 32
 The problem of risk to deposits does not arise here, because the securities in the fund are purchased for the account of the customer, not the Bank. The ICI does claim, however, that the Bank's indirect holdings in the Account may amount to an interest in individual companies sufficient to influence its credit decisions. The short answer is that, since this indirect risk is present in all bank investments in securities for the account of customers, that problem was not within the contemplation of the Glass-Steagall Act.
 
 
 33
 With regard to the third abuse treated by 16, the ICI points out that because the Bank's compensation is tied to the size of the fund, there will be pressure to market the participations to maintain and increase its assets. I agree.[9] But the Bank is under similar pressure to sell all the services of its trust department. The Bank's interest in earning a regulated fiduciary charge bears little resemblance to its interest in earning an indeterminate distributing profit from securities which it owns or underwrites, and the interest forbidden by 16 is the latter.
 
 
 34
 Section 21 of the Act prohibits banks from engaging '* * * in the business of issuing, underwriting, selling, or distributing, at wholesale or retail, or through syndicate participation, stocks, bonds, debentures, notes, or other securities * * *.' It was enacted to extend the prohibitions of 16 to members of the Federal Reserve System who were not national banks. Congress did not intend to bar those banks from buying and selling securities 'for the account of customers,' so 21 appears to add nothing to the argument under 16. If anything, the language of 21 confirms the view that Congress was concerned in both provisions with prohibiting bank dealing in speculative securities for the traditional and direct form of distribution profit.[10]
 
 
 35
 (2) Sections 20 and 32
 
 
 36
 Sections 20 and 32 of the Act were enacted to maintain the separation between commercial banking and securities dealing by prohibiting interlocks and affiliations of personnel. Section 20 forbids certain types of bank affiliation with any organization 'engaged principally' in the same brand of securities dealing forbidden as a direct bank activity by 21. One type of prohibited affiliation, defined in 221a(b)(3), ordinarily exists when a majority of the directors of a securities organization are also directors of any one member bank.
 
 
 37
 Section 32 generally prohibits directors, officers, or employees of organizations 'primarily engaged' in securities dealing from serving in those capacities for a member bank. The Federal Reserve Board has consistently held that 32 prohibits bank officials from serving as officials of open-end investment companies because such companies (mutual funds) are primarily engaged in issuing their own shares. 12 C.F.R. 218.101 (1951). The Board ruled, however, that the Account and the Bank were a single entity for purposes of 32, since the Account would be a department of the Bank except for purposes of Investment Company Act. So long as the Account remained under the 'effective control' of the Bank, the Board stated that there was no prohibited interlock under 32. 30 Fed.Reg. 12836 (1965), adding 12 C.F.R. 218.111(j) (1965).[11]
 
 
 38
 The participants' reserve power to sever the connection with the Bank would be worth something in the event of extraordinary mismanagement, but barring this contingency, the Account will remain part of the Bank's organization. Under the single entity theory, the Bank cannot interlock with itself but that is not really the point. The clear purpose of 20 and 32 is to prevent banks from entering into prohibited forms of securities dealing by the back door. We have held that the Bank may enter the business of operating the Account by the front door. The organizational pattern imposed to satisfy the requirements of the Investment Company Act does not in this context create a prohibited interlock or affiliation any more than the Account itself constitutes a forbidden excursion into the securities business.
 
 
 39
 The establishment of a bank-sponsored collective investment fund is not barred by the banking laws. A commingled managing agency account is a descendant of the individual managing agency account and the common trust fund, fitting within the traditional authority of banks to manage other people's money in a fiduciary capacity sanctioned by the Federal Reserve Act. Where the fiduciary tie between the bank and multiple principals is looser, the Comptroller's regulations and the securities laws will take up the slack. The essential element in this judgment on the applicability of the Glass-Steagall Act is the fact that the securities in the Account are bought and sold for the account of customers. The sale of an investment service to a potentially large number of customers gives rise to obligations under the securities laws, but these do not convert otherwise lawful transactions for the account of customers into prohibited securities dealings within the meaning of the Glass-Steagall Act.
 
 
 40
 The major consequence of expanded investment service by banks will be a quantitative change in the volume of securities bought, sold, and held by banks. While substantial transactions in securities by banks may be essential for the modern management of their customers' money, an increase in their already massive securities holdings for the account of customers has some disquieting consequences for the underpinnings of corporate accountability and competition in the economy at large.[12] The dimensions of the problem are broader, however, than the banking laws on the books. The Glass-Steagall Act enforces the separation of commercial banking and a particular kind of securities dealing. Its legislative history affords little support and even less guidance for a judicial decision to limit bank transactions in securities for customers because today they differ in degree.
 
 III
 
 41
 VALIDITY OF EXEMPTIONS FROM 10 OF THE INVESTMENT COMPANY ACT
 
 
 42
 The NASD, for its part, claims that the Bank's control of the Account is all too effective. It contests the orders by the Securities and Exchange Commission granting certain of the exemptions from 10 of the Investment Company Act requested by the Bank prior to registration of the Account as a diversified, open-end management investment company under the Act. The exemptions together permit three or 60 percent of the Account's five-member Committee to be persons affiliated with the Bank.
 
 
 43
 Section 10 of the Act was enacted to protect shareholders of investment companies from exploitation by insiders with conflicting interests in other companies or lines of business by requiring that a certain percentage of directors be free of affiliations which may involve divided loyalties. Without the exemptions, 10 of the Act would preclude the Account from having a majority of directors who are officers, directors, or employees of (1) a principal underwriter, 15 U.S.C. 80a-10(b)(2), (2) investment bankers, 80a-10(b)(3), and (3) a single bank, 80a-10(c). While the Bank fits each of these statutory categories, the overriding issue is the propriety of the exemption granted from 10(c) to permit a maximum of three instead of two Bank officers to serve on the five-member Committee. A working majority of Bank directors was essential to allow the Account to function in conformity with the banking laws.
 
 
 44
 Before considering the exemption from 10(c), it bears emphasis that there is nothing unusual in the fact that the Bank as investment adviser has majority control of the Committee of the Account. Open-end investment companies have traditionally been controlled and managed by their investment advisers; investors are buying their advice. Section 10(a) of the Act provides that 60 percent of the directors of an investment company may be affiliated with the investment adviser. Section 10(d), moreover, permits certain types of 'no-load' funds to have only one unaffiliated director if they meet specified conditions. The Bank sought but was denied an exemption which, if granted, would have enabled it to have only one unaffiliated Committee member.[13]
 
 
 45
 Given these facts, the NASD's assertion that the Committee will abdicate its supervisory responsibilities because the Bank has 'effective control' of the Account in the eyes of the banking authorities requires a showing of something more than the normal pattern of majority control by an investment adviser. Nothing in the Comptroller's regulations still applicable precludes the Committee from exercising its responsibilities. Although Regulation 9, as originally promulgated, did not take account of the requirements of the Investment Company Act, all provisions of Regulation 9 inconsistent with that Act were superseded by the Comptroller's written approval of the Account in the form necessary to satisfy the Securities and Exchange Commission. The Bank's majority control for purposes of day-to-day management of the fund is a false problem. The real issue is whether exemptions allowing an extra director on the Bank side will undercut the Committee's watchdog role in areas of potential conflict of interest.
 
 
 46
 Section 6(c) of the Investment Company Act empowers the Commission to grant exemptions from the Act, or any rule or regulation adopted under it, '* * * if and to the extent that such exemption is necessary or appropriate in the public interest and consistent with the protection of investors and the purposes fairly intended by the policy and provisions' of the Act. 15 U.S.C. 80a-6(c). The Commission has exercised this authority to exempt persons not within the intent of the Act and generally to adjust its provisions to take account of special situations not foreseen when the Act was drafted. Transit Investment Corporation, 28 S.E.C. 10, 16 (1948); The Atlantic Coast Line Company, 11 S.E.C. 661, 666-667 (1942).
 
 
 47
 In granting the exemptions at issue, the Commission first observed that the Account differs on the one hand from the bank-dominated securities affiliates of the twenties whose abuses inspired 10[14] and, on the other, from open-end investment companies (mutual funds) not subject to the supervision of the Comptroller. For these reasons, it was appropriate to consider whether a bank-sponsored fund was a type of investment company requiring the standard measure of unaffiliated directors or whether exemptions were justified by its novel characteristics. The Commission concluded that the risks of conflict of interest would be adequately controlled by the provisions of the Investment Company Act still applicable, supplemented by the Comptroller's regulations, and that the exemptions would permit the establishment of a desired new investment medium, still subject to all the safeguards necessary for the protection of its investors.
 
 
 48
 The conflict of interest problems created by bank affiliation with investment companies are of a different order when the fund is sponsored by the bank. In the proceedings below, the Commission considered four danger zones, previously cited by former Chairman William L. Cary in testimony before Congress recommending regulation of collective investment funds,[15] and urged by the NASD as reasons for denying the exemptions.
 
 
 49
 A. Retention of substantial cash deposits for the Account in the bank
 
 
 50
 The Commission discounted the danger that the Bank might retain an unwarranted portion of the Account's assets in cash in order to earn money for the Bank, stating that the temptation to leave funds uninvested would be contrary to the Account's stated policy of investment for long-term growth of capital and income, and to the Bank's interest in having the fund's assets increase. The interest in increasing the assets in the fund dictates not only that funds already held be invested in growth securities, but also, as we have seen, creates pressure to increase the number of participants. The undisputed fact that the Account will compete with the mutual fund industry can be expected to inhibit retention of its income-producing assets in the form of lopsided cash deposits, There is an important point of convergence between the interests of the Bank directors qua commercial bankers and their interest in the success of an investment medium offered as part of the Bank's services, a convergence not present when Bank personnel serve as directors of independent investment companies.
 
 
 51
 The Comptroller's regulations, moreover, state that funds held in a fiduciary capacity by banks shall not be held uninvested or undistributed for a period longer than is reasonable for the proper management of the particular account. 12 C.F.R. 9.10(a). Observance of this regulation is policed through examinations of bank trust departments which occur at least three times in every two years. 12 U.S.C. 481. The Commission reasonably concluded that the Bank's interest in holding the Account's asset in cash was offset by this combination of the carrot and the stick.
 
 
 52
 B. Use of Account investments to shore up Bank loans
 
 
 53
 Considered under 16 of the Glass-Steagall Act was the danger that the Bank might make unsound loans to shore up companies in which it had made investments for the Account. From the standpoint of the Investment Company Act, the risk is that the Bank will make bad investments for the Account to shore up unsound loans. In a letter to the Senate Committee on Banking and Currency, Chairman William McChesney Martin of the Federal Reserve Board explained why this area of risk was not regarded as significant.
 
 
 54
 For many years banks have participated in the management of employee benefit funds and other fiduciary accounts that hold stocks and other securities in an aggregate amount far exceeding those held by the entire mutual fund industry. The examinations conducted by bank supervisory agencies have disclosed practically no such misuse by banks of their investment advisory and management functions. In the case of managing agency funds, an additional safeguard is the prophylactic restrictions and requirements of the Investment Company Act of 1940, particularly publicity of the financial transactions of registered investment companies, which almost inevitably would expose such malfeasance. A further deterrent would be the adverse impact on a collective fund's performance-- its comparative financial record-- if any of its resources were used to make unprofitable investments; the detrimental effect on sales of participations might outweigh any benefits the bank could reasonably expect from its breach of fiduciary duty.[16]
 
 
 55
 In addition to taking note of the Comptroller's supervision of investments, the Commission cited its own supervision of transactions involving a joint arrangement between the Bank acting as a principal and the Account under the insider provision of 17(d) of the Act, 15 U.S.C. 80a-17(d),[17] and concluded that the margin for misconduct of this sort was narrow.
 
 
 56
 C. Purchase by the Account of securities underwritten by the Bank
 
 
 57
 The danger that the Account's funds might be used to promote the Bank's investment banking business is relevant generally to the exemption from 10(c) and specifically to the exemption from 10(b)(3). Section 10(b)(3) would have required that a majority of the directors of the Account be unaffiliated with an investment banker. The Bank is in the investment banking business to the extent that it participates in syndicates which underwrite debt securities of governmental authorities.
 
 
 58
 I concur in the Commission's judgment that there is no basis for concern that the Bank can or will use the Account to further its limited investment banking business. The Account is primarily a stock fund. It is not permitted to purchase any securities from the Bank, 15 U.S.C. 80a-17(a), and cannot purchase government securities from another member of a syndicate where the Bank participates as principal underwriter. 15 U.SC. 80a-10(f). The Commission conditioned the exemption by prohibiting purchases from syndicate members even after the Syndicate has terminated but the members hold unsold allotments.
 
 
 59
 D. Allocation of brokerage to existing or potential Bank customers
 
 
 60
 Former Chairman Cary observed that banks often distribute brokerage to those brokers with whom the Bank has or seeks reciprocal dealings, and that this may be contrary to the best interests of the Account's investors. This is one breed of the 'bird-dog' problem presented when bankers direct investment business toward companies whose banking business they desire in return. Such a practice would, of course, depart from the brokerage policy set forth in the prospectus. The Bank's stated objective in placing orders is to obtain the most favorable prices and execution of orders and, secondarily, to deal with brokers and dealers who provide the Bank as investment adviser with supplementary research and statistical information or market quotations.
 
 
 61
 Reliance on the Bank's representations is not wholly satisfying. Allocation of brokerage for the Bank's benefit is a subtler form of self-dealing than questionable purchases of securities or maintenance of an undue cash balance, and one less amenable to control through disclosure and supervision by the agencies. Nonetheless, brokerage may be improperly distributed in the course of banks' already extensive securities purchases for the account of customers, and it is appropriate to point out that Congress apparently did not consider this threat to be of critical significance when it exempted common trust funds from the Act entirely. See 15 U.S.C. 80a-3(c)(3).
 
 
 62
 The Commission's orders do not rest upon a sanguine assumption that there are no conflicts of interest incident to bank-sponsored investment funds, but rather proceed from a showing that the dangers are significantly different from those involved in other types of bank-investment company affiliations. Because the Bank earns only a regulated fiduciary charge tied to the amount of the Account's assets, the Bank-affiliated directors' interest in attracting more customers coincides with the interests of investors and to some degree counter-acts the incentive to hold the fund's assets in the form of commercial deposits. The restrictions upon Bank underwriting and Bank transactions with the Account make it unlikely that the Bank can profit by using the fund to unload or backstop its bad or indifferent investments, a major function of the bank-dominated securities affiliates of the twenties. To the extent that such hazards as improper brokerage allocation remain, the Commission could reasonably have concluded that two independent directors would perform adequately as watchdogs, with the enforcement powers of the Comptroller adding extra teeth.
 
 
 63
 Finally, the NASD claims that the Commission made an expedient bargain in granting the exemptions in order to head off legislation to exempt bank-sponsored funds from the securities laws. It is true that the Commission's assertion of jurisdiction over such funds generated legislative proposals, along with some friction between agencies of the Executive;[18] but I view the decision differently. Taking due account of the reduced potential for conflicts of interest in bank-sponsored funds and the near-complete coverage of the securities laws, the Commission determined that the supervision of the Comptroller would compensate for the absence of an independent tie-breaker on the Committee of the Account. This was a fair trade.
 
 IV
 STANDING
 
 64
 A. Standing of the Investment Company Institute
 
 
 65
 The ICI claims standing to challenge competition from banks on the ground that the Comptroller has authorized a competive activity specifically prohibited by Congress in the Glass-Steagall Act. Cf. Baker, Watts & Co. v. Saxon, 261 F.Supp. 247 (D.D.C.1966), affirmed sub nom. Port of New York Authority v. Baker, Watts & Co., 129 U.S.App.D.C. 173, 329 F.2d 497 (1968); Saxon v. Georgia Assn. of Ins. Agents, 399 F.2d 1010 (5th Cir. 1968).
 
 
 66
 As a general rule, competitors lack standing to challenge competition created or enhanced by governmental action, even if it is illegal, unless they can claim the benefit of an implied or express statutory aid to standing. Pennsylvania Railroad Co. v. Dillon, 118 U.S.App.D.C. 257, 335 F.2d 292, cert. denied sub nom. American S.S. Co. v. United States, 379 U.S. 945, 85 S.Ct. 437, 13 L.Ed.2d 543 (1964). The Glass-Steagall Act was not intended by Congress to protect mutual funds from competition from banks, so they do not have standing as intended beneficiaries; and the Act contains no aggrieved party provision. Contrast Hardin v. Kentucky Utilities, 390 U.S. 1, 88 S.Ct. 651, 19 L.Ed.2d 787 (1968); F.C.C. v. Sanders Bros. Radio Station, 309 U.S. 470, 60 S.Ct. 693, 84 L.Ed. 869 (1940). The District Court held, however, that the ICI was an implied, though not an intended beneficiary of the Glass-Steagall Act, and granted it standing to sue as a private attorney general to enforce the separation between commercial banking and securities dealing, despite the absence of an aggrieved party provision to support that role.
 
 
 67
 We are all agreed that this holding is exceptional, but so is this case. While the majority concludes from the cases that there is no satisfactory authority for standing, I find in those cases no reason to deny standing, and good reason to grant it. First, the authorities for the rule denying competitors standing to challenge unlawful competition are inapposite. Second, the basic justification for entertaining competitors' suits to challenge administrative action as statutory aggrieved parties, intended beneficiaries, or licensees is to vindicate a public interest, and not a private right. The absence of a statutory aid to standing in this case is adventitious, and I would grant appellants standing to assert the public interest without it.
 
 
 68
 1. Competitors' standing to challenge unlawful competition without a statutory aid to standing
 
 
 69
 Analysis of suits by competitors confirms the Supreme Court's observation that 'the various rules of standing applied by federal courts have not been developed in the abstract. Rather, they have been fashioned with specific reference to the status asserted by the party whose standing is challenged and to the type of question he wishes to have adjudicated.' Flast v. Cohen, 392 U.S. 83, 101, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). The general rule denying standing to competitors who can claim no statutory aid to standing is derived from two types of cases in which their interest in attacking allegedly unlawful competition has not been found reasonably proportionate to the burden on governmental agencies of defending against such suits. In one class of cases, privately-owned utilities have been denied standing to challenge legislative public power programs. See, e.g., Alabama Power Co. v. Ickes, 302 U.S. 464, 58 S.Ct. 300, 82 L.Ed. 374 (1938); Tennessee Electric Power Co. v. T.V.A., 306 U.S. 118, 59 S.Ct. 366, 83 L.Ed. 543 (1933); Kansas City Power & Light v. McKay, 96 U.S.App.D.C. 273, 225 F.2d 925, cert. denied, 350 U.S. 884, 76 S.Ct. 137, 100 L.Ed. 780 (1955). These cases draw much of their vitality from considerations of separation of powers and the doctrine 'that a person may not maintain a suit to enjoin the use of Government funds, even if such use is claimed to be in violation of law.' In suits of this nature, 'the fact that the plaintiff is suffering an economic detriment from competition assisted by a loan or grant of Government funds, does not give him standing to sue.' Baker, Watts & Co. v. Saxon, 261 F.Supp. at 249. Cf. Saxon v. Georgia Assn. of Ins. Agents, 399 F.2d at 1020-1021 (concurring opinion).
 
 
 70
 There are similarly sound policy reasons why competitive injury does not confer standing to challenge administrative decisions affording some incidental aid to another competitor or group of competitors in an industry. Minor or speculative economic injury is not worth burdening the agencies and the courts with skirmishes among businesses over comparative advantages resulting from allegedly illegal agency action. See Pennsylvania Railroad Co. v. Dillon, 118 U.S.App.D.C. at 262, 335 F.2d at 297.
 
 
 71
 These, then are the considerations underlying the many opinions which deny standing with the homily that competition is our economic norm. To acknowledge that cases denying standing to competitors are governed by (1) considerations of separation of powers, and (2) a desire to limit actions against the government, rather than by rigid abstract rules, seems to me only to do justice to the subtleties of standing as an element of justiciability. In suits by competitors, the nature of the claim is plainly relevant to the status of the economic interest asserted as a basis for standing. Here the ICI does not challenge the constitutional propriety of legislation or government spending. It does not ask this court to invoke due process or substantial evidence standards to afford it a remedy for marginal injury from an illegal administrative action. It points out, instead, that national banks operate under a regime of enumerated powers and prohibitions carefully laid down by Congress, and asks us to decide whether the competition authorized by the Comptroller violates specific provisions of the banking laws, one of which carries criminal penalties for bank entry into the securities business. 12 U.S.C. 378.
 
 
 72
 In these circumstances, to put the ICI out of court with the incantation that competition is our economic norm is insupportable in law and fact. No case stands for the rule that authorization of novel and prohibited-- even criminal-- business activity by administrative agencies is part of the rough-and-tumble of a competitive market. And in point of fact, toe-to-toe competition between mutual funds and commercial banks has never been the norm. The Comptroller's action introduces a powerful new element into a market previously closed to commercial banks by the rulings of the Federal Reserve Board, enforcing the same prohibitions now largely committed to the supervision of the Comptroller. This case falls outside the authorities for the general rule that competitors lack standing to challenge illegal competition.
 
 
 73
 We are not locked into conventional concepts of unfair competition in assessing a competitor's interest for purposes of standing. Cf. Jaffe, Standing To Secure Judicial Review: Private Actions, 75 Harv.L.Rev. 255, 265-266 (1961). It would not be far-fetched to conclude that competition illegally authorized by an agency which has allegedly ignored statutory prohibitions is unfair. But while there is arguably a private interest meriting protection here, it is plain that the overriding interest in enforcement of the Glass-Steagall Act is a public one. The question is whether the ICI may assert the public interest without a statutory aid to standing.
 
 
 74
 2. Competitors' standing to challenge unlawful competition with a statutory aid to standing
 
 
 75
 (a) Aggrieved party statutes
 
 
 76
 Since the decision in F.C.C. v. Sanders Bros. Radio Station, 309 U.S. 470, 60 S.Ct. 693, 84 L.Ed. 869 (1940), competitors have been granted standing to challenge administrative action under statutory aggrieved party provisions despite the fact that the statute does not require that their competitive interests be given weight by the agency. Competitors need not even be members of the industry subject to a specific regulatory statute to sue under it, so long as they can show aggrievement by administrative action pursuant to the statute. See Clarksburg Publishing Co. v. F.C.C., 96 U.S.App. D.C. 211, 225 F.2d 511 (1955); Philco Corp. v. F.C.C., 103 U.S.App.D.C. 278, 257 F.2d 656 (1958), cert. denied, 358 U.S. 946, 79 S.Ct. 350, 3 L.Ed.2d 352 (1959). Competitors whose interests and injuries are not legally protected or even immediately relevant to a regulatory jurisdiction are given standing as private attorneys general to represent the public interest in the proper administration of a regulatory scheme. Scripps-Howard Radio, Inc. v. F.C.C., 316 U.S. 4, 14, 62 S.Ct. 875, 86 L.Ed. 1229 (1942); Associated Industries v. Ickes, 134 F.2d 694 (2d Cir.) vacated as moot, 320 U.S. 707, 64 S.Ct. 74, 88 L.Ed. 414 (1943).
 
 
 77
 (b) Intended beneficiaries
 
 
 78
 Long before Sanders, the Supreme Court had held that competitors have standing to challenge unlawful competition when they can show that a statute was intended to afford some protection to their economic interests. Chicago Junction Case, 264 U.S. 258, 44 S.Ct. 317, 68 L.Ed. 667 (1924). The Chicago Junction theory is the only logical support for cases holding that a license, grant, or other property interest makes some competitors more worthy plaintiffs than others. The significance of a license for standing is not its conventional status as a property right but the fact that licensing may indicate a legislative intent to limit competition in a market by regulating entry. Licensees may be intended beneficiaries entitled to rely on a regulatory scheme, with standing to enforce it. See Frost v. Corporation Comm'n, 278 U.S. 515, 49 S.Ct. 235, 73 L.Ed. 483 (1929) (Dissenting opinions of Justices Brandeis and Stone).
 
 
 79
 In Chicago v. Atchison, Topeka & Santa Fe Ry., 357 U.S. 77, 78 S.Ct. 1063, 2 L.Ed.2d 1174 (1958), the Supreme Court granted standing to a motor carrier to challenge the operation of a new carrier which had not obtained a permit required by statute on the ground that the first carrier was adversely affected and contended that the competition was prohibited by a valid city ordinance. 357 U.S. at 83, 78 S.Ct. 1063. The holding on standing does not even refer to the fact that the plaintiff carrier had a license; the point was that one party was lawfully in business and one allegedly was not. In such cases, the limitation on the number of entrants in a market is not really intended to benefit a licensee, but to assure to the public an adequate level of services from economically viable enterprises. The licensee-plaintiff is vindicating a public interest. His private interest is his reliance on the rules protecting the public.
 
 
 80
 Since the enactment of aggrieved party provisions giving competitors standing in most regulated industries, the intended beneficiary theory has conferred standing in exceptional cases where there is no express statutory aid to standing, notably in an action against the TVA and in the spate of suits against the Comptroller. In Hardin v. Kentucky Utilities, 390 U.S. 1, 88 S.Ct. 651, 19 L.Ed.2d 787 (1968), the Supreme Court granted standing to a private utility to adjudicate a dispute over statutory area limitations on the expansion of TVA, a comparatively clear case of market allocation by the legislature.
 
 
 81
 Competitors in regulated industries have been granted standing as intended beneficiaries of a regulatory scheme where the statute (1) requires equal treatment of competitors (Chicago Junction), (2) regulates the number of entrants into a market (Chicago v. Atchison, Topeka & Santa Fe), and (3) allocates markets among competitors (Hardin). In each case the legislature has concluded that the public interest in an adequate level of efficient services is furthered by some restriction on competition. When private parties sue to enforce those restrictions, they are necessarily asserting a distinct public interest more important than their own.
 
 
 82
 3. Competitors' standing to sue the Comptroller
 
 
 83
 The banking laws affect competition by keeping banks out of specified business activities, but the limitation of competition in certain markets is a by-prod uct of prohibitions, whose overriding purpose is to protect the banks and their depositors' fortunes. Two courts have nonetheless granted standing to a group of insurance agents and a data processing firm to challenge rulings of the Comptroller authorizing banks to enter their bailiwicks on the ground that certain provisions of the banking laws indicate an intent to protect their interests. In Saxon v. Georgia Assn. of Ins. Agents, 399 F.2d 1010 (5th Cir. 1968), the majority held that 92 of the National Bank Act, 12 U.S.C. 92, permitting banks to act as insurance agents in cities of 5,000 inhabitants habitants or less was intended to protect insurance agents in larger towns from bank competition. But it seems more likely that the sale of insurance was never an activity within the intent of the statutory provision granting banks 'all such incidental powers as shall be necessary to carry on the business of banking,' 12 U.S.C. 24(7), and that the general ban on bank entry into the insurance business was qualified solely for the purpose of strengthening weak banks in small towns. The interest of insurance agents in retaining the implied prohibition in larger communities is unrelated to the intent of Congress in enacting it in the first place. 399 F.2d at 1019 (concurring opinion).
 
 
 84
 Similarly, in Wingate Corp v. Industrial National Bank, 408 F.2d 1147 (1st Cir. 1969), the plaintiff data processors argued that solicitation by banks of data processing business from the business community at large was not a power incidental to banking, and that recently enacted limitations on the data processing activities of bank service corporations, jointly formed by small banks to enable them to purchase computer equipment, were intended to protect independent data processing companies.[19] The First Circuit accepted this argument, relying heavily upon the fact that the National Society of Public Accountants had proposed the limiting amendment. But the fact that the organized accountants pressed for an explicit limitation does not mean it was designed to protect them. Enterprises that lobby for legislation are not necessarily transformed into intended beneficiaries if it passes.
 
 
 85
 I agree that the insurance agents and the data processors in these two cases did have standing, but I am not persuaded that the specific provisions relied upon by the courts were intended to create protected classes of competitors any more than the Glass-Steagall Act was intended to benefit mutual funds or investment bankers. Cf. Baker, Watts & Co. v. Saxon, 261 F.Supp. 247 (D.D.C.1966), aff'd sub nom. Port of New York Authority v. Baker, Watts & Co., 129 U.S.App.D.C. 173, 392 F.2d 497 (1968). It is fruitless to look for an intent to protect these businesses from competition from banks in legislation designed to restrict or prohibit bank activities for reasons having nothing to do with competition. The critical question of congressional intent is this: Did Congress intend to immunize rulings of the Comptroller from judicial review? This is the critical question because substantial immunity is the consequence of denying standing to competitors. They are the only parties likely to challenge the authorization of prohibited bank activity. Cf. Office of Communication of the United Church of Christ v. F.C.C., 123 U.S.App.D.C. 328, 335, 359 F.2d 994, 1001 (1966). The intended beneficiaries of the banking laws, if the class is narrower than the public, are bank customers who have no immediate and compelling interest in litigation to further long-term sound banking.
 
 
 86
 It is fortuitous that there is no aid to standing for these plaintiffs. If underwriters, insurance agents, data processors, and securities dealers are right that banks are prohibited by law from entering their businesses, Congress would never have foreseen that administrative rulings under the banking laws would substantially affect their economic interests. Judging from the purpose and pattern of the banking laws, the question of aggrieved non-bank competitors never came up.
 
 
 87
 This conclusion finds support in the fact that when Congress anticipated competition problems, it dealt with them in specific terms, notably in provisions of the banking laws equalizing the legal conditions of competition between state and national banks. In dozens of cases, state banks, and recently a state banking agency have had standing to challenge the authorization of new branches of national banks in violation of the statutory limitation of national bank branching to areas where state branches are permitted. 12 U.S.C. 36(c). See, e.g., Whitney Nat. Bank v. Bank of New Orleans & Trust Co., 116 U.S.App.D.C. 285, 323 F.2d 290 (1963), rev'd on other grounds, 379 U.S. 411, 85 S.Ct. 551, 13 L.Ed.2d 386 (1965); Nuesse v. Camp, 128 U.S.App.D.C. 172, 385 F.2d 694 (1967).[20] Thus, under the usual rules of standing, a state bank can enjoin illegal branching by national banks, but there is no party who can sue to enforce the separation between commercial banking and the securities business. Given the relative triviality of the threat to the banking system posed by outlaw branch banks as compared to the menace of illegal securities dealing, this result is too bizzarre to have been intended by Congress.
 
 
 88
 Disappointed license applicants can call the Federal Communications Commission to account for its decisions in the name of the public. Regulated carriers and state banks may challenge unlawful competition because courts have inferred some protection to their interests from a regulatory scheme. In both cases, competitors' suits are furthering the public interest at stake in the rules. All that is missing in this case is a 'logical nexus' between the competitive interest of the mutual fund industry and the aims of the banking laws. Flast v. Cohen, 392 U.S. 83, 102, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). It is missing because Congress had more important interests in mind.
 
 
 89
 Principles of standing in competitors' suits have operated as rules of thumb to sort out proper plaintiffs and legal issues of competition deemed appropriate for judicial resolution. Both are present here. It is not disputed that the members of the ICI are aggrieved by the Comptroller's ruling. Bank-sponsored diversified investment funds open to $10,000 customers will compete for the cream of the market now cornered by the mutual funds. The ICI presents a question of statutory construction to define the boundaries of official authority, a type of question well within the traditional competence of courts of law. It is the only party likely to assert the public interest in observance of the banking laws by the agency responsible for enforcing them. In the exceptional circumstances of this case, I would grant the ICI standing to vindicate the public interest despite the absence of a statutory aid to standing.[21]
 
 
 90
 B. Standing of the National Association of Securities Dealers
 
 
 91
 The NASD claims standing to seek judicial review under 80a-42(a) of the Investment Company Act, which accords a right of review to 'any person or party aggrieved by an order issued by the Commission * * *.' 15 U.S.C. 80a-42(a). It relies principally on the case of F.C.C. v. Sanders Bros. Radio Station, 309 U.S. 470, 60 S.Ct. 693, 84 L.Ed. 869 (1940), to support its standing to sue as a private attorney general to vindicate the public interest in the proper enforcement of the Investment Company Act. This standing issue is settled by Sanders. There is no requirement that a plaintiff establish a legally protected private interest to sue under 'party aggrieved' statutes. Office of Communication of United Church of Christ v. F.C.C., 123 U.S.App.D.C. at 335, 359 F.2d at 1001. The only question is whether the NASD is aggrieved by the Commission's orders granting the exemptions from the Act to the Bank.
 
 
 92
 The NASD represents about 3,700 registered brokers or securities dealers. Most of its members sell shares in mutual funds to investors and are compensated by sales commissions from the 'load' charged by the funds. The Bank's commingled investment Account and similar bank-sponsored funds sure to follow[22] are an addition to the group of 'no-load' funds whose shares are not sold at a commission by NASD members. No one denies that bank-sponsored collective investment funds will provide substantial competition to both 'load' and 'no-load' mutual funds. Limitation of sale of participations to customers with a minimum of $10,000 to invest does not narrow the area of competitive overlap enough to make probable injury insubstantial. Surveys indicate that individual sales of $10,000 or more have accounted for about half the mutual fund industry's total dollar sales.[23] NASD members stand to lose commissions earned from the cream of the business. This is enough to show that they are aggrieved parties under 80a-42(a).
 
 
 93
 It is clear, moreover, that the NASD is aggrieved as a result of the Commission's orders. Analysis of the legal problems in establishing the Account in conformity with the banking laws confirms the Bank's concession that without the exemptions, it would be 'effectively precluded' from operating the Account. Both conditions of standing to sue under the aggrieved party provision are met.
 
 
 94
 For these reasons, I join in the decision of the court.
 
 
 95
 BURGER, Circuit Judge (concurring):*
 
 
 96
 Although I am unable to join in the rationale underlying Judge Bazelon's basis for standing of Appellees, nonetheless I am prepared to agree with the result in order to make a majority holding for review of the merits of a subject of such importance. I do so in order to reach consideration of the merits for such aid as some examination at our level may be useful to further judicial review.
 
 
 97
 (1)
 
 
 98
 As I see it, there are three generally accepted theories of standing which guide the courts in ascertaining whether a plaintiff is the appropriate 'party seeking to get his complaint before a federal court.' Flast v. Cohen, 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968). The first emerges from those cases involving a statutorily defined basis for standing. See, e.g., Scripps-Howard Radio, Inc. v. FCC, 316 U.S. 4, 62 S.Ct. 875, 86 L.Ed. 1229 (1942); FCC v. Sanders Bros. Radio Station, 309 U.S. 470, 60 S.Ct. 693, 84 L.Ed. 869 (1940). The second evolves from those cases where the plaintiff holds a public license, grant, or recognized property interest which supports his assertion of litigable rights. See, e.g., Frost v. Corporation Com'n., 278 U.S. 515, 49 S.Ct. 235, 73 L.Ed. 483 (1929); Whitney National Bank v. Bank of New Orleans & Trust Co., 116 U.S.App.D.C. 285, 323 F.2d 290 (1963), rev'd on other grounds, 379 U.S. 411, 85 S.Ct. 551, 13 L.Ed.2d 386 (1965). A third theory of standing centers around a finding of intended 'statutory protection' which has been bestowed upon the plaintiff thereby entitling him to sue in order to preserve the interests which the statutory scheme has found to be worthy of protection. This third concept of standing supported the development of a less easily identifiable strain of decisions focusing on a theory of 'unlawful competition.'
 
 
 99
 The 'unlawful competition' theory as a basis for standing would seem to have two distinct definitional interpretations: (1) 'to compete in any manner, whether legal or illegal techniques are utilized, is 'unlawful competition"; (2) 'to engage in non-prohibited competition by utilizing techniques or engaging in activities which are in themself illegal is 'unlawful competition". Under the former interpretation, either no one may enter the competition in a given kind or area of endeavor or the particular party seeking to enter the competition has been prohibited from doing so in order to protect those parties already pursuing the activity under some grant, franchise or license. Under the latter interpretation, competition per se is not proscribed but the very conduct which constitutes the competition is in itself illegal. In my view, the first interpretation is a valid one which necessarily emerges from the recognized desire to 'protect' extant interests and can properly form the basis for a claim of standing. The second finds no support in a close analysis of the myriad cases reviewing the prerequisites to standing, is a misinterpretation of the conceptual genesis of the theory of unlawful competition, and cannot support a claim of standing.
 
 
 100
 An illustration of this can be seen in the distinction drawn in the recent Hardin v. Kentucky Utilities Co., 390 U.S. 1, 5-6, 88 S.Ct. 651, 654, 19 L.Ed.2d 787 (1968) case. There, the Supreme Court explained that:
 
 
 101
 The economic injury which results from lawful competition cannot, in and of itself, confer standing on the injured business to question the legality of any aspect of its competitor's operations.
 
 
 102
 The reasonable corollary of this proposition would be that a party could question the legality of its competitor's operations if, independently, it could demonstrate that the competition per se was 'unlawful.' In its subsequent analysis,[1] the Court made clear that by utilizing the term 'unlawful competition' it meant to preserve the operative distinction between an evaluation of the lawfulness of the competition itself and an evaluation of the legality of the particular conduct which produces the competition.[2]
 
 
 103
 To resolve the standing question the Court did not find it necessary to inquire into the legality or illegality of the implementing operations which the Tennessee Valley Authority was to utilize to enter the market for selling electricity in the areas in question.[3] All that was necessary was a finding that 'one of the primary purposes of the area limitations in 15d of the (Tennessee Valley Authority Act of 1933 as amended) was to protect private utilities from TVA competition.' Id. at 6, 88 S.Ct., at 655. An area limitation, of course, lends itself to ready interpretation, hence competition per se by TVA would be 'unlawful' if TVA had in fact encroached upon the market area which had been reserved for the local utility companies and from which TVA's entry had been prohibited. Because Kentucky Utilities Co. was a member of the class so meant to be protected, it had standing to litigate to obtain an adjudication of its substantive rights under the protective statutory scheme, and 'no explicit statutory provision (was) necessary to confer standing.' Id. at 7.
 
 
 104
 The rationale underlying this finding of standing is that Congress affirmatively intended Kentucky Utilities to be protected from TVA competition. In essence, it was a clearly identifiable beneficiary of a statutory grant of protection, and as such, it was entitled to sue to protect the rights conferred. Whether TVA's operations which led to the competition were in themselves legal or illegal was irrelevant to the determination of Kentucky Utilities' standing.
 
 
 105
 In addition to these three categories of standing cases, some hybrid variations-- some of which are valid, others not-- have emerged. They include: (1) the Flast v. Cohen, supra, provision for taxpayer challenges of federal expenditures allegedly in violation of specific constitutional limitations; (2) the unique application of the 'consumer aggrievement' concept articulated in Office of Communication of United Church of Christ v. FCC, 123 U.S.App.D.C. 328, 359 F.2d 994 (1966), pursuant to the 'person aggrieved' provision of the Federal Communications Act, 47 U.S.C. 309(d) (1964); (3) the discretionary standing theory broached in Curran v. Clifford, (Dec. 27, 1968), opinion vacated, petition for rehearing en banc granted, No. 21,040 (D.C.Cir., April 3, 1969); (4) the concept that 'aggrievement in fact' is sufficient to give a party standing to challenge agency action under 10 of the Administrative Procedure Act; (5) the improper utilization of the 'unlawful competition' theory discussed supra and employed by some courts which have granted standing in cases involving recent promulgations by the Comptroller of the Currency.[4]
 
 
 106
 (2)
 
 
 107
 Against this background we should examine Appellees' claim of standing in the present litigation. As set forth in the preceding opinion, Appellee-Institute is a national association representing 177 open-end management investment companies commonly designated as 'mutual funds' and the 88 investment advisers and 78 principal underwriters of these funds. The mutual fund members of the Institute represent 94 percent of all such companies in the United States. The Institute membership also includes several investment advisers and principal underwriters of individual mutual funds which are individual Appellees in this suit.
 
 
 108
 The major basis for Appellees' claim of standing to challenge the Comptroller's regulations is that the entry of the national banks into the so-called 'mutual fund industry' would constitute 'unlawful competition' which Appellees as representatives of the industry may challenge.[5] However, an alalysis of the facts of this controversy illustrates Appellees' reliance on an incorrect interpretation of the concept of 'unlawful competition.' To perceive the faulty basis of the claims of Appellees, their precise contentions must be studied.
 
 
 109
 Appellees are complaining of unauthorized administrative action creating a form of competition specifically prohibited by Congress in the Glass-Steagall Act. The challenged regulations authorize banks to engage in unlawful competition, permitting them to enter the mutual fund business and engage in issuing, selling, distributing and underwriting securities in violation of Sections 16, 20, 21 and 32 of the Glass-Steagall Act. Appellees are not merely challenging a program of governmental assistance, financial or otherwise, to lawful competitors whose competitive activities have been specifically authorized by Congress.
 
 
 110
 Brief for Appellees 66.
 
 
 111
 Appellees then go on with sweeping contentions 'that competitors have the right to challenge new competition, authorized by administrative action, which has been prohibited by statute.'
 
 
 112
 Furthermore, there is no justification for the gloss which Appellants attempt to put on Hardin requiring a specific and express Congressional intent to protect particular plaintiffs in order to confer standing on them to challenge regulations which create unlawful competition. The well-established rule, in this Court, the Supreme Court, and other courts, is directly to the contrary. Where the effect of the statutory prohibition is to bar competition, those subject to such illegal competition created by administrative regulation have the standing to challenge the regulation.
 
 
 113
 Brief for Appellees 66, 67, 73.
 
 
 114
 Appellees have thus sought to shift the focus to the activity of the Bank and its alleged violation of the strictures of the Glass-Steagall Act; their burden is to establish their own status as intended statutory beneficiaries of a freedom from competition by national banks.
 
 
 115
 In a recent decision denying standing in a suit brought by the Association of Data Processing Service Organizations and Data Systems, Inc.[6] challenging allegedly improper national bank entrance into the data processing business, the Eighth Circuit made some cogent observations:
 
 
 116
 Much of the confusion on standing seems to arise from the emphasis upon the issues to be adjudicated or upon the possible merits of the substantive claim rather than upon an examination of the status of the complaining plaintiff. Whether or not a defendant is alleged to be engaged in illegal competition cannot by itself determine a plaintiff's standing to complain * * * The fundamental aspect of standing is that it focuses on the party seeking to get his complaint before a federal court and not on the issues he wishes to have adjudicated. It seems clear that an allegation of 'illegal competition' is not the balancing determinant of a plaintiff's standing. The primary search must rest on whether the plaintiff's status is one which enjoys a private interest entitled to protection or is one which the law recognizes to be of such legal significance to allow a party to act as a public representative for a public interest.
 
 
 117
 Association of Data Processing Service Organizations, Inc. v. Camp, 406 F.2d 837 (8th Cir., Feb. 6, 1969).
 
 
 118
 That Court found that the plaintiffs were 'competing in a non-regulatory field of free competition,' they were not members of any class 'designedly protected by statute,' and they possessed no legal interest 'recognized at law.' Id. at 843. Accordingly, they had no standing to challenge the new rulings by the Comptroller which allowed the bank to offer these new services.
 
 
 119
 As previously indicated, the Glass-Steagall Act does not contain the familiar provisions which constitute an aid to standing in terms of allowing a 'person aggrieved' to challenge administrative decisions or promulgations made pursuant to the Act. Nor can Appellees validly assert any 'license, grant, or recognized property interest' entitling them to standing. It is equally clear that giving even the broadest reading of the legislative history embellishing the Act will not support the conclusion that Congress meant to bestow upon Appellees any protection from competitive injury.[7] With these bases of standing foreclosed, Appellees necessarily turn to the inaccurate definition of 'unlawful competition' which I find to be without support in an analysis of the 'competition' cases.
 
 
 120
 For the most part the cases relied on by Appellees are readily distinguishable. In American Trucking Ass'n v. United States, 364 U.S. 1, 80 S.Ct. 1570, 4 L.Ed.2d 1527 (1960), the Court found a statutory purpose to protect 'all modes of transportation' and the complaining party had the benefit of a specific 'party in interest' aid to standing. Interstate Commerce Act, 49 U.S.C. 305(g). Chicago v. Atchison, T. & S.F. Ry., 357 U.S. 77, 78 S.Ct. 1063, 2 L.Ed.2d 1174 (1958), involved a plaintiff which held a license, thereby entitling it to oppose another carrier's operation without obtaining a license. In Frost, supra, the Court found that a cotton gin licensee had a 'property right' and could challenge the invasion of this right by another without a valid license. In Whitney Nat'l. Bank, supra, the Court allowed a state bank to challenge the Comptroller's authorization of new branch banks from national bank competition. The Georgia Insurance Ass'n. case, supra, involved a provision of the National Bank Act which evidenced an affirmative legislative intent to protect local insurance agents from the competition of national banks.
 
 
 121
 Some of the language in Port of New York Authority, supra, is more troublesome. There, a group of investment bankers challenged the Comptroller's authority under Glass-Steagall to permit national banks to distribute revenue bonds not backed by the taxing power of the public body issuing the bonds. In acknowledging standing for the investment bankers to pursue their challenge, the District Court explained:
 
 
 122
 While no one may maintain a suit to restrain lawful competition merely because he is suffering an economic detriment, nevertheless, a person has a standing to complain against illegal competition, or specifically, against competition on the part of a person who lacks the legal right or power to pursue the competitive activities. In this respect this action is precisely parallel to cases in which a State bank has been permitted to maintain suit to restrain the Comptroller of the Currency from granting permission to a national bank to establish a branch that would compete with the plaintiff.
 
 
 123
 Id. 261 F.Supp. at 248.
 
 
 124
 It seems to me that the District Court gave undue weight to the claim of unlawful competition and in effect equated it with competition created by illegal activities. This made it possible to rely on the 'branch banking cases' which are not really applicable, since those cases turn on the provisions of the National Bank Act which limit branch banking of national banks specifically in order to protect state banks from the unrestricted competition of national banks. See, Pennsylvania R.R. Co. v. Dillon, 118 U.S.App.D.C. 257, 335 F.2d 292, cert. denied sub nom., American Hawaiian S.S. Co. v. Dillon, 379 U.S. 945, 85 S.Ct. 437, 13 L.Ed.2d 543 (1964); Whitney National Bank v. Bank of New Orleans & Trust Co., 116 U.S.App.D.C. 285, 323 F.2d 290 (1963), rev'd on other grounds, 379 U.S. 411, 85 S.Ct. 551, 13 L.Ed.2d 386 (1965).[8]
 
 
 125
 Appellees here pursue their associational livelihood in a securities marketing industry which thrives on competition in the quest for the investment dollar. The entry of the national bank commingled investment accounts into this competition admittedly adds a whole new category of competitors but it is fundamentally not different from the situation which arises, for example, when 'gas stations' sell candy bars, soft drinks and other staples for which travellers have need. Nevertheless, before Appellees may sue to prevent bank competition which affects their private financial interests, they must establish that the Glass-Steagall Act contemplated that they were to be protected from this competition in their pursuits. Even assuming that the competing activity of the Appellant Bank may be otherwise violative of a provision of the Act, I can find no indication that the Act intended to afford protection to securities dealers generally. My position therefore is one of reservation amounting to virtual disbelief in any standing in Appellees.
 
 
 126
 (3)
 
 
 127
 Persuasive arguments can be advanced that the pressure for someone with standing to challenge conduct in matters of large public interest is so great that irreconcilable abstractions and distortions have emerged to satisfy what are thought to be the needs. Quite often courts pursued a 'bootstrap' or circular logic by initially analyzing the merits, in order that a finding of standing to challenge actions seems more palatable because the court has already found a possible encroachment of 'rights' which it desires to review. To evaluate standing solely or even primarily on such visceral reactions does violence to the judicially created concepts of standing:
 
 
 128
 The fundamental aspect of standing is that it focuses on the party seeking to get his complaint before a federal court and not on the issues he wishes to have adjudicated.
 
 
 129
 Flast, supra, 392 U.S., at 99, 88 S.Ct., at 1952.[9]
 
 
 130
 Evaluating Appellees' qualifications as prospective litigants on behalf of their own private economic interests and the public's interests, it becomes evident that they are indeed adverse both as respects their actual prosecution of this litigation and in regard to their fundamental challenge to the Comptroller's authority to allow the national banks to engage in this type of securities activity. Their financial interest in these proceedings has been examined in the preceding opinion, and when this is coupled with authoritative prognostications of impending financial harm to their interests if the Comptroller's regulations are allowed to stand,[10] it is obvious that there exists one cogent qualification of a challenger in the reasonable probability of factual aggrievement sufficient to insure the spirited adverseness necessary to judicial resolutions.
 
 
 131
 With this element satisfied, on this record the alternative to a grant of Appellees' claim to standing would be to effectively frustrate any challenge to the regulations in question.
 
 
 132
 (4)
 
 
 133
 Because of the factors discussed heretofore I am unable to set aside my grave doubts as to Appellees' standing to institute and maintain these suits. However, in the uncertain state of the law as to standing, there is something to be said on both sides of that question. I therefore resolve my doubts in favor of the Appellees and concur in the result of that portion of the foregoing opinion which holds that the Appellees have standing. I am influenced substantially, as I indicated at the outset, by the need for judicial examination of the important questions raised.
 
 
 134
 The record before us reflects that the Federal Reserve Board and other government agencies involved gave careful and comprehensive study to all aspects of this problem before taking the actions challenged by the mutual fund industry. Our review function is narrow and limited; it does not include the power to decide whether the public will be better served by one or the other modes of investing funds so as to achieve diversification, yield, safety or low cost. All that is the primary responsibility of the special regulatory bodies established by Congress for that purpose. On the face of the record there is, of course, nothing very startling about the decisions of the Comptroller, the Commission or of the Federal Reserve Board. In one form or another banks have been holding, managing and investing funds for customers for a long time. Indeed, when one considers the historical background it could be reasonably argued by banks that 'investment trusts' and more recently 'mutual funds' have invaded their domain. However, such arguments are of a kind which are for the regulatory agencies.
 
 
 135
 Here the Comptroller of the Currency, after study, has decided that the commingled managing agency account is a function which is authorized by law for banks and is in the public interest; the Securities and Exchange Commission and the Federal Reserve Board have approved. Other state and federal regulatory bodies are in accord. The regulatory bodies charged by Congress with these large responsibilities have construed the grant of power and with their accumulated expert experience have decided these issues. Their decisions are entitled to substantial deference and on this record I see no basis for disturbing their conclusions.
 
 
 
 *
 These opinions were prepared prior to June 21, 1969 and are issued pursuant to the Judgment of this court entered on that date
 
 
 [1]
 The petition for review of the Commission's order was previously dismissed by this court on the ground that the NASD lacked standing as a party aggrieved under 80a-42(a) of the Investment Company Act. National Association of Securities Dealers v. Securities & Exchange Comm'n, No. 20164 (decided Nov. 21, 1967). A petition for rehearing en banc was granted, and the division opinion vacated on January 1, 1968. The en banc order was subsequently vacated on April 12, 1968, to permit the assigned division to reconsider the matter. The case was consolidated for decision with Nos. 21661-21662, and considered without reargument
 
 
 [1]
 Regulatory responsibility for the fiduciary activities of national banks was transferred from the Federal Reserve Board to the Comptroller pursuant to Public Law No. 87-722, 76 Stat. 668 (1962), codified at 12 U.S.C. 92a (1964)
 
 
 [2]
 26 Fed.Reserve Bull. 393 (1940), 12 C.F.R. 206.102 (1947); 42 Fed.Reserve Bull. 228 (1956); and see 25 Fed.Reg. 12479 (1960), announcing the Board's intention to investigate whether the common trust fund regulations should be amended to exclude inter vivos trusts, because the device of the revocable trust could and had been used to obtain investment management through a common trust fund
 
 
 [3]
 The Bank's plan does not conform in all respects to Regulation 9 as originally issued due to the adjustments required to satisfy the requirements of the Investment Company Act. The plan, as amended, received the Comptroller's written approval under 12 C.F.R. 9.18(c)(5), and it is expected to set the pattern for other bank-sponsored investment funds. There is accordingly no need to review the provisions of Regulation 9 as it was originally promulgated
 
 
 [4]
 See Statement of then Chairman Manuel F. Cohen, Hearings on S. 2704 Before a Subcommittee of the House Committee on Banking and Currency, 89th Cong., 2d Sess. 132-138 (1966)
 
 
 [5]
 The Glass-Steagall Act permits banks to market government revenue bonds banked by the taxing power of the public authority issuing the bonds. 12 U.S.C. 24 (Seventh). The Comptroller's regulation broadening bank underwriting authority to include revenue bonds was invalidated in Baker, Watts & Co. v. Saxon, 261 F.Supp. 247 (D.D.C.1966), affirmed sub nom. Port of New York Authority v. Baker, Watts & Co., 129 U.S.App.D.C. 173, 392 F.2d 497 (1968)
 
 
 [6]
 Hearings Pursuant to S.Res. 71 Before a Subcommittee of the Senate Committee on Banking and Currency, 71st Cong., 3d Sess. 1055-1066 (1961)
 
 
 [7]
 Id. at 1063-1064
 
 
 [8]
 See Address of Senator Bulkley, 75 Cong. Rec. 9912 (1932)
 
 
 [9]
 The Bank would have us stress the restrictions upon merchandising the Account. The Bank is authorized to offer participations in response to unsolicited requests, to persons on Bank premises, and to existing customers. The Bank's affidavit states that it will accept the customer's money if it is satisfied that the Account's investment policy is suited to his needs. It appears from the mailing to 'valued customers,' however, that they will be acceptable if they read the invitation, with its caveats, and the prospectus and send in the tear-out authorization with $10,000. The $10,000 minimum should accomplish a measure of natural selection, but the Bank's decision on the customer's suitability is unlikely to be so discriminating that the decision itself is a check on the issuance of participations. At any rate, the merchandising problem is more relevant to the question of the proper exercise of fiduciary powers than to entry into the securities business within the meaning of the Glass-Steagall Act
 
 
 [10]
 Section 21 provides criminal penalties for willful violations. The Attorney General is charged with prosecutions under 21, and has indicated that, while it is not clear whether the operation of the Account would involve criminal liability, the approval of the banking agencies precludes a prosecution against the Bank. See letter of January 24, 1966, to the Securities and Exchange Commission from Assistant Attorney General Fred M. Vinson, in Hearings on S. 2704 Before a Subcommittee of the House Committee on Banking and Currency, supra, n. 4 at 588
 
 
 [11]
 See also the Board's letter of March 31, 1966, to the Bank stating that its ruling would stand even though the Securities and Exchange Commission required that there be two independent directors, or 40 percent of the Committee, instead of the single unaffiliated director proposed by the Bank
 
 
 [12]
 For recent comment on the power of banks as institutional investors to control so-called publicly held corporations, see Studies by the Staff of the Cabinet Committee on Price Stability 52-54 (Jan. 1969). See also a warning that the trend toward conglomerate banking makes it possible for banks to condition access to credit upon the borrower's use of the bank's other services and dealings with its subsidiaries in 'The Growth of Unregistered Bank Holding Companies-- Problems and Prospects,' Staff Report for the House Committee on Banking and Currency, 91st Cong., 1st Sess. 2 (1969)
 
 
 [13]
 Notwithstanding the provisions of 10(a) and 10(b)(2), 10(d) permits all but one of the directors of certain types of 'no-load' funds to be affiliated with the investment adviser if certain conditions are met. 15 U.S.C. 80a-10(d). To qualify for the exception under 10(d), the Bank would have had to register as an investment adviser, principally involved in that business. An exemption from this condition was denied
 
 
 [14]
 Securities affiliates were organized by banks to evade the prohibition against investment of bank funds in common stocks. The affiliates, usually closed-end investment companies, often took loans from the sponsor banks, secured by the stock held by the affiliate, and then used the borrowed funds to trade or invest in the bank's stock or in other securities in which the bank had an interest. The affiliates also made loans of investment company funds to the bank. Shareholders of the affiliate and depositors of the bank were both on the losing end of these arrangements. The abuses were detailed in a comprehensive study submitted to Congress by the Commission prior to the adoption of the Glass-Steagall Act. Investment Trusts and Investment Companies, Report of the Securities and Exchange Commission, Pt. 1, H.R.Doc. No. 707, 75th Cong., 3d Sess. 94 (1938)
 
 
 [15]
 Hearing on Common Trust Funds-- Overlapping Responsibility and Conflict in Regulation, Before a Subcommittee of the House Committee on Government Operations (Hereinafter Hearing on Common Trust Funds), 89th Cong., 1st Sess. 11-12 (1963)
 
 
 [16]
 Letter dated December 14, 1967, from William McC. Martin, Jr., Chairman, Federal Reserve Board, to Senate Committee on Banking and Currency, in Hearings Before the Senate Banking and 438 to S. 1659, 90th Cong., 1st Sess. 1223-26 (1968)
 
 
 [17]
 Shoring up loans or acquiring banking business in connection with the purchase of stock for the fund may be such a joint transaction. Note, Commingled Trust Funds and Variable Annuitties: Uniform Federal Regulation of Investment Funds Operated by Banks and Insurance Companies, 82 Harv.L.Rev. 435, 451 (1968)
 
 
 [18]
 Hearing on Common Trust Funds, supra n. 15 at 2-3 and 161-164
 
 
 [19]
 Contra, Assoc. of Data Processing Serv. Organ., Inc. v. Camp, 406 F.2d 837, cert. granted, 395 U.S. 976, 89 S.Ct. 2128, 23 L.Ed.2d 764 (June 23, 1969)
 
 
 [20]
 Section 92a of the Federal Reserve Act, 12 U.S.C. 92a, authorizing national banks to act in any other fiduciary capacity open to state banks in the locality, discussed supra pp. 8-9, indicates a similar concern for equalizing the ground rules of competition between state and national banks
 
 
 [21]
 The commentators agree that a conventional 'legally protected interest' or statutory aid to standing should not be required in all cases. Professor Davis has long maintained that 10 of the Administrative Procedure Act, 5 U.S.C. 701 (Supp. II 1965-66), accords a right of review to any person aggrieved in fact by administrative action. 3 K. C. Davis, Administrative Law Treatise 22.02 (1958); Standing: Taxpayers and Others, 35 Chi.L.Rev. 601, 619 (1968). Aggrievement in fact is all that is needed to create a case or controversy in the constitutional sense. There is some support for Professor Davis' interpretation in the legislative history of 10, but most courts, including this circuit, have rejected it. Kansas City Power & Light v. McKay, 96 U.S.App.D.C. 273, 225 F.2d 924, cert. denied, 350 U.S. 884, 76 S.Ct. 137, 100 L.Ed. 780 (1955)
 Professor Jaffe views the private attorney general theory grafted on to aggrieved party provisions as a variant of the common law public action, rooted in English and American state law. If a party is suing as a private prosecutor, Professor Jaffe regards his individual interest as irrelevant, but in such cases, 'judicial discretion in terms of the size, urgency, and clarity of the issue at stake' should be exercised in the decision to take jurisdiction. Jaffe, Standing to Secure Judicial Review: Private Actions, 75 Harv.L.Rev. at 286-87.
 The theory that standing may be accorded as a matter of discretion when the plaintiff is aggrieved in fact combines the two commentators' approaches. Curran v. Clifford, (decided Dec. 27, 1968), opinion vacated, petition for rehearing en banc granted April 3, 1969. These approaches would support a finding of standing to challenge administrative action where (1) the plaintiff is aggrieved, or (2) the question presented is important, urgent and susceptible of judicial resolution, or (3) both conditions are present.
 
 
 [22]
 Speaking of its exemption decision, the Commission has stated: 'A pattern has thus been set which other banks may follow if they see fit.' Hearings on S. 2704 Before a Subcommittee of the Senate Committee on Banking and Currency, 89th Cong., 2d Sess. 138. At the hearings, the American Bankers Association and individual banks demonstrated great interest in commingled accounts. Ibid. at 31-61
 
 
 [23]
 See testimony of an industry representative in Hearings on S. 2704 Before a Subcommittee of the House Committee on Banking and Currency, supra n. 22 at 96
 
 
 **
 Consistent with the views herein expressed which are directed to First Nat'l City Bank v. I.C.I., No. 21,661, I concur in Judge Bazelon's finding of standing as respects NASD v. SEC, No. 20,164 and join in the disposition on the merits in that case
 
 
 [1]
 In the language following the abovequoted statement, the Court continued:
 But competitive injury provided no basis for standing in the above-cases simply because the statutory and constitutional requirements that the plaintiff sought to enforce were in no way concerned with protecting against competitive injury. In contrast, it has been the rule at least since the Chicago Junction Case, 264 U.S. 258, 44 S.Ct. 317, 68 L.Ed. 667 (1924), that when the particular statutory provision invoked does reflect a legislative purpose to protect a competitive interest, the injured competitor has standing to require compliance with that provision.
 390 U.S. at 6, 88 S.Ct., at 654.
 
 
 [2]
 This court recently recognized this distinction in Pennsylvania R.R. Co. v. Dillon, 118 U.S.App.D.C. 257, 259-260, 335 F.2d 292, 294-295, cert. denied sub nom., American Hawaiian S.S. Co. v. Dillon, 379 U.S. 945, 85 S.Ct. 437, 13 L.Ed.2d 543 (1964);
 'Legal wrong,' as we have only recently noted, is the invasion of a legally protected right. See Gonzalez v. Freeman, supra, 118 U.S.App.D.C. 180 at 186 n. 6, 334 F.2d 570 at 576 n. 6. Thus, in order to make out a claim of 'legal wrong' under Administrative Procedure Act 10(a), appellants must assert some legally protected right to be free of the competition * * *. This court has very recently spoken on this aspect of standing. When 'Congress has not given them any such standing by express or implied provision of statute * * *, mere economic competition made possible by governmental action (even if allegedly illegal) does not give standing to sue in the courts to restrain such action. For purposes of standing in this case, the sufficiency of appellants' allegations of 'legal wrong' thus depend upon congressional intent to bestow upon them a legal right to protection from such competition.
 
 
 [3]
 Significantly, the Court finally concluded that TVA 'could * * * properly make its low-cost power available to consumers in this * * * area * * *.' 390 U.S. at 5, 88 S.Ct. at 654. Therefore, the Court's resolution of the standing issue can not be evaluated as a rationalization prompted by its determination that Kentucky Utilities Co.'s substantive rights had been violated
 
 
 [4]
 For an extensive collection of the recent cases involving 'unlawful competition' as a theory for challenging activity authorized by the Comptroller see Saxon v. Georgia Assoc. of Independent Ins. Agents, Inc., 399 F.2d 1010, 1017 n. 6 (5th Cir. 1968). See also Judge Bazelon's opinion at pp. 98-101
 
 
 [5]
 Appellees also assert that 702(a) (Supp. II, 1967), embodies an independent and self-sufficient statutory basis for standing. I do not feel that the APA was meant to arrest the development of the law of standing as of the date of its passage:
 We would certainly be prepared to hold in an appropriate case that one who complains of administrative action may find a remedy under the Act beyond the strict scope of judicial review recognized prior to its adoption * * *.
 Kansas City Power & Light Co. v. McKay, 96 U.S.App.D.C. 273, 282, 225 F.2d 924, 933, cert. denied, 350 U.S. 884, 76 S.Ct. 137, 100 L.Ed. 780 (1955). Nevertheless, although the review provisions of the APA were not meant to retard the judicial development and adaptation of the law of standing, it does not establish an independent right to review absent judicially articulated notions of 'legal wrong' of 'adversely affected or aggrieved * * * within the meaning of any relevant statute.' See Pennsylvania R.R. Co. v. Dillon, supra note 2.
 
 
 [6]
 Data Systems, Inc. is a Minnesota corporation engaged in the data processing business. Association of Data Processing Organizations is an incorporated association domiciled in Pennsylvania whose members perform data processing services throughout the United States
 
 
 [7]
 See Judge Bazelon's opinion at p. 96. The thrust of the legislation, and the concern of the drafters, was to protect the banking public through the maintenance of a sound national banking system. Senator Bulkley, one of the managers of the bill, made it explicit in his remarks that the bill was not focused on protecting the investing public, much less the securities industry:
 The purpose of this bill does not extend to safeguarding purchasers of securities as such. The purpose of this bill is to improve the operation of the Federal reserve system and the banks which are members of it. The object of the inhibitions which I am discussing here is not primarily to protect the investing public, although that is a worthy purpose, but our field is to protect the operations of the banking system itself, and to protect the depositors and customers of the banks so that they shall have the service from national and State member banks which they are entitled to expect.
 
 
 [75]
 Cong. Rec. 9913-14 (1932). See also Jaffe, Standing to Secure Judicial Review: Private Actions, 75 Harv.L.Rev. 255, 266 (1961)
 
 
 [8]
 In Pennsylvania R.R. Co. v. Dillon, we specifically noted this critical distinction:
 Appellants' reliance on Whitney is also misplaced. There, this court held that certain state banks had standing to attempt to enjoin the Comptroller of the Currency from issuing to a national bank a Certificate of Authority allegedly in violation of federal banking statutes. The court found that federal statutes had guaranteed that state banks would be free of certain competition from national banks.
 118 U.S.App.D.C. at 262 n. 6, 335 F.2d at 297 n. 6.
 
 
 [9]
 The Flast Court spoke in terms of the 'concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.' However, I suggest that the thrust of the 'constitutional' reference was in relation to the ability to challenge the particular action-- federal expenditures in sensitive constitutional areas-- there involved and was not intended to retard the flexibility of sound concepts of standing when the plaintiff's assertions focus on non-constitutional violations in areas of administrative activity
 
 
 [10]
 Indeed, the Comptroller himself predicted that in the next decade commercial banks operating under these regulations 'might capture as much as two billion dollars of mutual fund business.' Hearings on H.R. 8499, 9410 before the Commerce and Finance Subcommittee of the House Committee on Interstate and Foreign Commerce, 88 Cong.2d Sess. p. 26 (1964)